897 A.2d 1003

JOANNE OLIVIERI, PLAINTIFF–APPELLANT, v. Y.M.F. CARPET, INC., A CORPORATION, DEFENDANT–RESPONDENT.

Argued February 14, 2006—Decided May 17, 2006.

512

*Alan L. Krumholz* argued the cause for appellant (*Krumholz Dillon*, attorneys).

*Christopher J. Koller* argued the cause for respondent (*Charles I. Epstein*, attorney; *Mr. Koller* and *Mr. Epstein*, on the brief).

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal arises in the context of a claim that an employee was wrongfully terminated from employment in violation of the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8 (CEPA). We must consider whether the employee's successful application for unemployment compensation benefits should be given collateral estoppel effect so as to preclude the employer from claiming in the CEPA action that the employee voluntarily left her employment. If the employer were to succeed in that assertion, no actionable employment termination would have occurred for CEPA purposes. We hold that collateral estoppel does

not apply to the determinations arising from unemployment compensation proceedings because of the nature and extent of the process afforded in and the limited purposes underlying those proceedings.

I.

Starting in May 2000, plaintiff Joanne Olivieri [1] was employed as a part-time collection clerk by defendant Y.M.F. Carpet, Inc., a carpet, rug, bathmat, and linoleum tile wholesaler owned by Jacob (Jacob) and Frieda (Frieda) Shemesh. In the course of plaintiff contacting customers who owed balances to defendant, a question arose concerning whether one of defendant's former salesmen, Shloami Levi (Levi), had pocketed payments from defendant's customers, which payments were not credited to the customers' accounts. Plaintiff advised defendant of this discovery.

According to plaintiff, in early February 2001, defendant requested that plaintiff prepare a Special Civil Part complaint against the former salesman, and plaintiff did so. After completing that task, plaintiff compiled the customer invoices needed to sustain the complaint against the former salesman. Here, however, the proofs differed. Plaintiff claimed that one of defendant's co-owners prepared false receipts corresponding to each invoice to show that Levi, the former salesman, in fact had received the sums reflected in the invoices, and requested that plaintiff sign and attach the false receipts to the invoices on file. Plaintiff testified that she refused to do so. In contrast, Frieda testified that plaintiff rightly discovered that some customers had produced payment receipts that were not reflected in defendant's accounts; that it was plaintiff who suggested the filing of the Special Civil Part complaint against Levi, including procuring and completing the necessary forms for defendant's signature; that plaintiff col-

---

[1] Although all of the pleadings, transcripts and a large portion of the documentary proofs in this action refer to plaintiff as "Joanne Olivieri," plaintiff's personal correspondence refers to "Jo Anne Olivieri."

lected the documentary proofs necessary to prosecute the action against Levi; and that defendant was well satisfied with plaintiff's efforts. Frieda flatly denied she ever prepared false receipts or asked plaintiff either to generate or authenticate any false documentation.

In the seven months that followed the preparation of the Special Civil Part complaint, the conflict over the facts became pronounced. Plaintiff testified, and defendant concurred, that plaintiff repeatedly demanded a full-time position, with a concomitant increase in her compensation and benefits, and that her discussions with Jacob, one of defendant's co-owners, on that subject became confrontational. Those confrontations escalated into a series of letters from plaintiff to defendant complaining about her treatment at defendant's hands.[2] The last of these letters, dated August 31, 2001 and addressed to Yaron Shemesh, Jacob's and Frieda's son, starkly demonstrates plaintiff's view of the deteriorating employment relationship between plaintiff and defendant and, for that reason, is presented in full:

> I confided in my legal advisor, about the hostile, exploitive, and modern type slavery work environment. I also mentioned, some jeopardizing health habitability issues, resulting in my work place. Conditions, which I have been forced to endure for the past 18 month. I did fail to mention, all the consumer advocacy internal financial matters.
>
> Concerning Jacobs persistent inhumane, threatening aggressive behavior. My legal advisor, then suggested that I reach out to your father, Jacob Shemesh, in writing. I would have preferred to have taken other legal measures, or maybe even voicing it all to the Jersey Journal, but, given the ironic circumstances. Instead, I chose to extend to you all, the courteous consideration, of settling this very delicate issue quietly, amongst ourselves. Mind you, I am not just venting anger, I am serious in all my actions, and will stand strong in my convictions.
>
> Although, I am not accustom, to easily forgive in a sensitive situation of this nature. I suppose, I could make an exception to that rule, just this once. I will of course ... expect a full apology from Jacob, for his intimidating, and irresponsible behavior. An apology which he should not hesitate to render, at any given

---

[2] None of the letters plaintiff sent prior to the date she claimed she was terminated from employment made any reference to plaintiff's claim that she was asked to forge documents to support the civil complaint against Levi, defendant's former salesman, or that she refused to do so.

moment, being he is of the Jewish faith, and culture. He had no right ... in stating, not once but, three times, that I was to lick the sole of his dirty shoe, for my employment there, and that I had been nothing but bulls shit. Stemming from a request I had made earlier that week, for a compensation in pay, vacations, medical/dental, or some form of employment benefits; which I felt, I had been entitled to.

As a loyal, long term employee at YMF, it was an extremely embarrassing equally hurtful scenario, more so ... with the entire office staff present, witnessing the thick friction. An utterly, appalling, disgracefully humiliating, mentally and emotionally traumatic predicament indeed. No decent human character, should have to be subjected to any such shameless behavior. "I did not deserve that degrading insult!" Jacobs' cruel, downright mean, and very offensive verbal remarks, are not to be taken lightly. I certainly will not stand for it, I refuse to continue in allowing this misconduct.

Furthermore, anyone who practices religion, kindness, common decency, possessing dignity, social, and human qualities, should not have to tolerate this, or any type of belittling harassment, regardless of their religion, social status, race/creed, ethnic background, financial status, or even their sexual preference.

It is a well known factor, no secret, that Jacob, lacks formal education, it explains his lack of comprehensive communication. However, this does not excuse his repulsive behavior. The academic knowledge of any person, for lesser, or for greater, should never be altered, or impede their spiritual inner goodness, and is not acceptable in any level of society, much less the work place, where one needs to spend a third of their life time.

It is with these words of wisdom that I close; and leave Jacob Shemesh, to wallow in his remorse.

Inexplicably, when plaintiff returned from a vacation on September 6, 2001, she placed a copy of that letter on the desk of each of defendant's employees.

When Frieda learned of this action, she asked to speak privately with plaintiff, a conversation that degenerated into plaintiff yelling at Frieda. Frieda suggested that plaintiff in fact go home, calm herself and return the next day so they could complete their discussion. That same day, Frieda sent a letter to plaintiff that explained:

When you first came to Y.M.F. we hired you on a part time basis. Little by little you took it upon yourself to increase your hours and then even worked through lunchtime. There was also a period of time in which you had been convicted of a crime and missed out on many days of work due to having to appear in court and

even being arrested.[3]  At that time we could have dismissed you but chose instead to help you out by allowing you to keep your job despite the fact you were out more than you were in.  At one time you did not show up for a week and did not even call or mail us of your absence.

We want you to know that we value your work here at Y.M.F.  You have shown yourself to be a capable collections officer.  We would like you to continue to work here at Y.M.F. however, we do not want to continue to have you behave in a hostile manner when we request any work from you.  . . . . If you cannot work under these conditions perhaps you should consider employment elsewhere. . . .

We apologize for any misunderstandings there may have been and hope that we can continue to work together in an orderly and civilized manner.

Plaintiff left defendant's premises that day and never returned to work thereafter.  Instead, two days later, plaintiff sent a letter to defendant, stating that "[y]ou fired me, because I had refused to go to court for you, on the [former salesman's] case.  'If you are rehiring me?'  We will need a signed contract, otherwise kindly forward my letter of termination."  The next day, without waiting for or receiving a response, plaintiff applied for unemployment compensation benefits.  On October 3, 2001, her application was denied "on the ground that she left work voluntarily without good cause attributable to such work." [4]

Plaintiff appealed the denial of unemployment compensation benefits and, on March 15, 2002, a hearing before an appeals examiner was held.  Plaintiff and her counsel appeared at the hearing, while Frieda, on behalf of defendant, "participated on the telephone." [5]  Without referring to either the seven month span

---

[3] While plaintiff was employed by defendant, plaintiff was tried and convicted of welfare fraud.  On September 18, 2001, plaintiff was sentenced to a suspended 180 day jail sentence and $19,000 in restitution.  Plaintiff's jail term was suspended because she asserted at her sentencing that she was then employed.  Yet, according to plaintiff in this litigation, she had been terminated from employment with defendant on September 6, 2001, twelve days before her sentencing.  Plaintiff acknowledged on cross-examination that the only reason she "didn't serve the time" was "because [she] was employed."

[4] The record does not contain a written version of the initial unemployment compensation determination;  the reference here to that determination appears in the appeal tribunal's decision.

[5] The record also lacks any transcript of the proceedings before the appeals examiner or any other reliable indication that the proceedings were recorded,

between the time plaintiff claimed she was asked by defendant to prepare a false report, or to the existence or import of the letters described above, on May 16, 2002, the appeals examiner accepted plaintiff's version of the events and tersely made the following findings:

[Defendant] had requested [that plaintiff] complete a report about [t]he transactions of an employee and a customer.

[Plaintiff] spoke with the owners [of defendant] about the report and the owners insisted that [plaintiff] change the facts to reflect what the owner[s] thought was appropriate and not what [plaintiff] wanted to accurately report.

When [plaintiff] failed to produce this report, she was asked to leave on 09/06/01.

[Plaintiff] did not voluntarily leave her job.

The appeals examiner therefore concluded that "[n]o disqualification applies under *N.J.S.A.* 43:21–5(a), as [plaintiff] did not leave her job voluntarily without good cause attributable to her work[,]" and that "[n]o disqualification arises under *N.J.S.A.* 43:21–5(b) as [plaintiff] was not discharged for misconduct connected with the work."

Defendant appealed to the Board of Review. Its June 26, 2002 findings of fact and opinion consisted solely of the following:

The Findings of Fact and Opinion as developed by the Appeal Tribunal and the allegations of [defendant] have been carefully examined.

Since [defendant] was given a full and impartial hearing and a complete opportunity to offer any and all evidence, there is no valid ground for a further hearing.

On the basis of the record below, we agree with the decision reached.

The decision of the Appeal Tribunal . . . is affirmed.

Defendant did not seek any further review of the allowance of unemployment compensation benefits to plaintiff.

In the interim, on October 23, 2001, plaintiff filed an action in the Law Division claiming that defendant retaliated against plaintiff by terminating her employment due to her refusal to provide false testimony or documentation in respect of the Special Civil

---

that the witnesses were sworn, that the witnesses were subjected to cross-examination, that only competent evidence was received, or that the decision of the appeals examiner was fairly based on the proofs adduced before him.

Part complaint against Levi, defendant's former salesman. Defendant denied those allegations and, after discovery was completed, the trial commenced. However, immediately before opening statements were made, the trial court considered plaintiff's *in limine* application to offer the written unemployment compensation appeals examiner and Board of Review determination in her case in chief as proof that she was terminated from her employment with defendant and for a ruling that, as a matter of law, the termination occurred on September 6, 2001. Defendant opposed that application, claiming that that determination was not entitled to collateral estoppel effect.

Relying on *Ensslin v. Twp. of N. Bergen*, 275 *N.J.Super.* 352, 646 *A.*2d 452 (App.Div.1994), *certif. denied*, 142 *N.J.* 446, 663 *A.*2d 1354 (1995), the trial court "look[ed] to the five factors set forth in the *Restatement [ (Second) ] of Judgment[s]* as to whether collateral estoppel prohibits re-litigation of the claim." The trial court concluded that "on the issue of whether or not [plaintiff] was terminated or voluntarily left [ ] the job, I find that that issue has been adjudicated in a competent forum which has expertise in the area, and that it was found in her favor that she was fired." The trial court noted, however, that "plaintiff is still going to have to bear the burden of proving that she was fired in violation of [CEPA]. That is not precluded here, and that is still her burden to prove, and she will still have to prove that." Defendant's motion for a stay pending an interlocutory appeal was denied and the trial commenced.

The jury found in plaintiff's favor on her CEPA claim and awarded her $25,061 in compensatory economic damages, $10,000 in compensatory emotional distress damages, and $25,000 in punitive damages. The trial court then added prejudgment interest of $2,584.82, for a total judgment in plaintiff's favor of $62,645.82. Defendant's motion for a new trial was denied and, pursuant to Section 6 of CEPA, *N.J.S.A.* 34:19–6, the trial court awarded plaintiff attorneys' fees and costs in the aggregate of $43,226.15.

Defendant appealed and the Appellate Division reversed. Focusing on the third exception to the overall rule of preclusion listed in *Restatement (Second) of Judgments* § 28 (1982), the panel held that the unemployment compensation determination in respect of whether plaintiff was terminated or voluntarily resigned from employment with defendant should not be accorded collateral estoppel effect "because of the difference in the 'quality and extensiveness' of the procedures followed in the informal proceeding before the unemployment hearing examiner as compared to the formal proceeding in the Law Division."[6] Based on that conclusion, the Appellate Division remanded the cause for a new trial.

We granted plaintiff's petition for certification, *Olivieri v. Y.M.F. Carpet, Inc.*, 185 *N.J.* 389, 886 *A.2d* 660 (2005). For the reasons that follow, we affirm the judgment of the Appellate Division.

## II.

Plaintiff argues that the trial court correctly gave preclusive effect to the unemployment compensation determination that plaintiff was terminated from her job with defendant. According to plaintiff, the procedures available in New Jersey's unemployment compensation award and appeal processes are sufficient to justify the application of the collateral estoppel doctrine in this instance, particularly when, as here, the preclusion sought is not of an entire claim, but merely of one fact among many that plaintiff must prove to sustain her burden. In her analysis of the five exceptions set forth in *Restatement (Second) of Judgments* § 28 (1982), as recognized and adopted by the Appellate Division in *Zoneraich v. Overlook Hosp.*, 212 *N.J.Super.* 83, 94, 514 *A.2d* 53

---

[6] The preclusive effect given by the trial court to the unemployment compensation determination was but one of seven separate issues raised by defendant before the Appellate Division. The panel did not address any of defendant's other issues because it held that the trial error in respect of collateral estoppel was sufficient to warrant a reversal and remand of the case.

(App.Div.), *certif. denied,* 107 *N.J.* 32, 526 *A.*2d 126 (1986), and *Ensslin v. Twp. of N. Bergen,* 275 *N.J.Super.* 352, 370, 646 *A.*2d 452 (App.Div.1994), plaintiff concludes that none of the exceptions is applicable and, hence, the unemployment compensation determination that plaintiff was terminated from employment was entitled to collateral estoppel effect.

Starting from the proposition that collateral estoppel is an equitable doctrine invoked in the exercise of a court's sound discretion, defendant asserts that three of the five exceptions to the application of the doctrine are present here: that plaintiff's claim for unemployment benefits and her CEPA claim are substantially unrelated; that the differences in the quality and extensiveness of the procedures available in the unemployment compensation review process vis-à-vis those available in the Law Division are so large as to prohibit the importation of an unemployment compensation determination into an action in the Law Division; and that the differences between the burdens of proof plaintiff must bear in her CEPA claim and in her unemployment compensation claim bar the application of collateral estoppel. For those reasons, defendant asserts that the unemployment compensation determination should play no role in plaintiff's CEPA claim.

### III.

### A.

 It is well settled that

> [f]or the doctrine of collateral estoppel to apply to foreclose the relitigation of an issue, the party asserting the bar must show that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [*In re Estate of Dawson,* 136 *N.J.* 1, 20–21, 641 *A.*2d 1026 (1994) (citations and parentheticals omitted).]

It is equally clear that "[e]ven where these requirements are met, the doctrine, which has its roots in equity, will not be applied when

it is unfair to do so." *Pace v. Kuchinsky,* 347 *N.J.Super.* 202, 215, 789 *A.*2d 162 (App.Div.2002).

We recently explained that

[i]t is generally recognized that the judicial principles underlying collateral estoppel and other doctrines of issue preclusion, such as *res judicata,* serve important policy goals that have currency in both administrative law and judicial settings. Our decisions have enumerated the benefits flowing from such doctrines, such as "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness." Thus, as administrative law procedures have matured in this State, courts have recognized that administrative tribunals can and do provide a full and fair opportunity for litigation of an issue for various purposes.

[*Hennessey v. Winslow Twp.,* 183 *N.J.* 593, 599–600, 875 *A.*2d 240 (2005) (citations and parentheticals omitted).]

As the Appellate Division noted in *Zoneraich v. Overlook Hosp.,* 212 *N.J.Super.* 83, 93–94, 514 *A.*2d 53 (App.Div.), *certif. denied,* 107 *N.J.* 32, 526 *A.*2d 126 (1986):

A party is precluded by collateral estoppel from relitigating matters or facts which the party actually litigated and which were determined in a prior action, involving a different claim or cause of action, and which were directly in issue between the parties. Adjudicative determinations by administrative tribunals are entitled to preclusive effect if rendered in proceedings meriting that deference. It is no objection that the administrative decision was subjected only to a lenient standard of review.

[ (citations omitted).]

*Accord Restatement (Second) of Judgments* § 27 (1982) ("Issue Preclusion—General Rule: When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.").

Our task, then, is to determine whether the procedures available in unemployment compensation matters are sufficient to warrant preclusive effect in other forums. Or, as *Ensslin v. Twp. of N. Bergen,* 275 *N.J.Super.* 352, 369, 646 *A.*2d 452 (App.Div.1994) (citation omitted), succinctly states, "judicial determinations by administrative agencies are entitled to preclusive effect if rendered in proceedings which merit such deference."

## B.

■ We agree with the Appellate Division's oft-repeated view that the determination whether administrative proceedings merit the deference accorded to final judgments is informed by the exceptions set forth in *Restatement (Second) of Judgments* § 28 (1982):

§ 28 Exceptions to the General Rule of Issue Preclusion

Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:

(1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or

(2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; or

(3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or

(4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or

(5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.

As was observed in *Pace v. Kuchinsky*, 347 *N.J.Super.* 202, 216, 789 *A.*2d 162 (App.Div.2002):

The factors favoring issue preclusion include: conservation of judicial resources; avoidance of repetitious litigation; and prevention of waste, harassment, uncertainty and inconsistency. Those factors disfavoring preclusion include: the party against whom preclusion is sought could not have obtained review of the prior judgment; the quality or extent of the procedures in the two actions is different; it was not foreseeable at the time of the prior action that the issue would arise in subsequent litigation; and the precluded party did not have an adequate opportunity to obtain a full and fair adjudication in the prior action.

[ (citations and internal quotation marks omitted).]

There are significant procedural and substantive safeguards that attend an action presided over by either a judge or an administrative law judge in this State and to which collateral estoppel effect is given. By comparison, the paucity of the record concerning the proceedings before the unemployment compensation examiner in this case leads inexorably to the conclusion that the third exception in the *Restatement* applies, that is that "[a] new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them[.]"

■ There was nothing in this record assuring that the unemployment compensation proceedings were recorded, thereby permitting a meaningful review. *See N.J.A.C.* 1:12–14.2(b) (providing that, at unemployment compensation hearings, all "testimony shall be ... recorded."); *N.J.A.C.* 1:12–14.6(a) ("[A]t the inception of the [telephone] hearing, ... all participants [should be advised] that the proceedings are being recorded."); *N.J.A.C.* 1:10–1(g) (providing for copy of sound recording upon request). The record is also barren of any proofs that the witnesses were sworn or that the witnesses were subjected to cross-examination, two key indicia of the reliability of proofs. *See N.J.A.C.* 1:12–14.2(b) (providing that, at unemployment compensation hearings, all live testimony must be presented under oath or affirmation, and be subjected to cross-examination). We simply cannot be certain that only competent evidence was received by the unemployment compensation examiner. *See N.J.A.C.* 1:12–5.1(b) ("[T]he decision as rendered must be supported by sufficiently substantial and legally competent evidence to provide assurance of reliability and to avoid the fact or appearance of arbitrariness."). There is nothing in this record that permits the necessary conclusion that the decision of the appeals examiner was fairly based on the proofs adduced before him. We thus agree with the Appellate Division that

the remedies sought by plaintiff in the administrative unemployment proceeding were substantially different from the remedies sought by plaintiff in the Law Division CEPA case. The administrative hearing before the unemployment hearing officer was conducted in an informal fashion. [Defendant] appeared without counsel through [one of its co-owners], who testified by telephone preventing the hearing officer from judging her demeanor, which is important when assessing the credibility of a witness. Administrative unemployment hearings are not bound by the Rules of Evidence and specifically permit hearsay evidence. *DeBartolomeis v. Bd. of Review*, 341 *N.J.Super.* 80, 83, 775 A.2d 87 (App.Div.2001); *N.J.A.C.* 1:12–15.1(b). Also [ ], the trial judge was not presented with a copy of the transcript of the proceedings before the hearing examiner to determine the sufficiency of the evidence presented on the issue. On issues of collateral estoppel, because Rules of Evidence are not applicable in administrative agency hearings, a review of the administrative hearing record, including the transcript, is generally necessary for the trial judge to determine whether the issue was "fully and fairly litigated."

Therefore, for reasons related to the conduct of these proceedings, and coupled with the public policy considerations that inform unemployment compensation determinations as discussed below, we also agree with the panel's conclusion that "the trial judge should have permitted [defendant] to argue that plaintiff left [her] employment [with defendant] for reasons other than being terminated because of the 'differences in the quality [and] extensiveness of the procedures followed' in the administrative hearing and in the Law Division."[7]

## C.

The purposes behind the unemployment compensation system are relevant considerations in determining whether to give collateral estoppel effect to an unemployment compensation determination. Undergirding New Jersey's unemployment compensation system is the Legislature's declaration that

economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The

---

[7] Because we find that the third *Restatement* exclusion to the application of the collateral estoppel doctrine applies here, we need not examine whether the remaining four exclusions apply.

achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state requires the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed after qualifying periods of employment.

[*N.J.S.A.* 43:21–2.]

That declaration of our State's public policy has led this Court to conclude that

the Legislature indicated that the underlying mission of the Act is to afford protection against the hazards of economic insecurity due to *involuntary* unemployment.

This Court has recognized that the primary purpose of the Act is to provide a cushion for the workers of New Jersey against the shocks and rigors of unemployment. Furthermore, the purpose of the [A]ct is to provide some income for the worker earning nothing, because he is out of work *through no fault or act of his own.*

Although the Act is to be liberally construed in favor of claimants to effectuate its remedial purposes, we have emphasized that it is also important to preserve the unemployment insurance trust fund against claims by those not intended to share in its benefits. The basic policy of the law is advanced as well when benefits are denied in improper cases as when they are allowed in proper cases. The Act, then, is designed to serve not simply the interest of the unemployed, but also the interest of the general public. To give [the] correct interpretation of this policy, the Court must carry in mind the dire and distressing situations against which the statute, as a matter of stated public policy, is directed.

[*Brady v. Board of Review,* 152 *N.J.* 197, 211–12, 704 *A.*2d 547 (1997) (citations, internal quotation marks and editing marks omitted).]

Describing the purposes of New Jersey's Unemployment Compensation Law, *N.J.S.A.* 43:21–1 to –24.30, the Appellate Division has noted that

this statute is concerned with the relief of emergencies in which claimants have been caught; and it is therefore to be supposed that in accommodation of its very purposes, the administrative machinery of the law has been designed and geared to secure expedition in the determination and payment of claims, including the huge volume of claims on appeal[.]

[*Kaske v. State,* 34 *N.J.Super.* 222, 227, 111 *A.*2d 915 (App.Div.1955).]

The salutary purposes of our unemployment compensation scheme, then, must inform the uses to which unemployment

compensation determinations may be applied. When juxtaposed against the type and manner of decisions to which we apply collateral estoppel effect, the very strengths of the unemployment compensation scheme in respect of the award of benefits become weaknesses: its speed of decision-making inhibits the deliberative process; its underlying purpose, the almost presumptive payment of unemployment compensation benefits, is at odds with a process that values a level playing field; and the disparity between what is at stake between an employer and an employee skews the results. Thus, fundamental differences abound between the unemployment compensation scheme and other adjudicative decisions, differences that lead to the conclusion that unemployment compensation determinations are not entitled to collateral estoppel effect.[8]

### D.

The importance of those differences has led other courts to deny collateral estoppel effect to unemployment compensation determinations. For example, in *Rue v. K–Mart Corp.*, 552 *Pa.* 13, 713 *A.*2d 82 (1998), the Supreme Court of Pennsylvania denied collateral estoppel effect to an unemployment compensation determination because Pennsylvania's unemployment compensation proceedings did not afford "a full and fair opportunity to litigate the [relevant factual] issue[.]" *Id.* at 21, 713 *A.*2d at 86. The Court identified

two significant factors that distinguish unemployment compensation proceedings from court proceedings. First, the unemployment compensation system is specifically designed to adjudicate matters quickly, because one of its primary goals is to "get[ ] money into the pocket of the unemployed worker at the earliest point that is administratively feasible." Thus, proceedings before [an unemployment compensation examiner] are, by design, brief and informal in nature.

Second, the amount of money in controversy in most unemployment compensation proceedings is, from the employer's perspective, quite minimal. The most the employer has at stake is a small increase in the amount of future contributions to the Unemployment Compensation Fund. In light of such minimal risk, the employ-

---

[8] This broad holding would apply to this case even if the procedural effects we have noted were absent.

er often has little incentive to litigate vigorously, or even to retain counsel and/or attend a hearing. This is in stark contrast to a subsequent civil action, which, as this case exemplifies, may subject the employer to liability for amounts tens of thousands of times greater than those at stake in the proceedings before the [unemployment compensation examiner].

[*Id.* at 20, 713 *A.*2d at 86 (citations and footnote omitted).]

Those concerns led the Court to conclude that "[t]he substantial procedural and economic disparities between unemployment compensation proceedings and later civil proceedings negate the preclusive effect of [an unemployment compensation examiner's] factual findings." *Id.* at 20–21, 713 *A.*2d at 86.

Many other courts have followed suit in denying collateral estoppel effect to unemployment compensation determinations in various settings. *See, e.g., Ferris v. Hawkins,* 135 *Ariz.* 329, 333, 660 *P.*2d 1256, 1260 (1983) (proceeding statutorily designed for personnel matters arising out of state employment, reasoning that "the legislature did not intend that the merits of a personnel dispute, the resolution of which is governed under a carefully mandated statutory scheme, be decided in a completely and totally separate unemployment compensation proceeding."); *Mahon v. Safeco Title Ins. Co.,* 199 *Cal.App.*3d 616, 245 *Cal.Rptr.* 103 (1988) (wrongful termination); *Salida Sch. Dist. v. Morrison,* 732 *P.*2d 1160 (Colo.1987) (§ 1983 civil action); *McClanahan v. Remington Freight Lines, Inc.,* 517 *N.E.*2d 390 (Ind.1988) (wrongful discharge); *Tuper v. N. Adams Ambulance Serv., Inc.,* 428 *Mass.* 132, 697 *N.E.*2d 983 (1998) (breach of contract, defamation, and tortious interference with contractual relationship); *Storey v. Meijer, Inc.,* 431 *Mich.* 368, 429 *N.W.*2d 169 (1988) (wrongful discharge); *Petition of Walker,* 138 *N.H.* 471, 641 *A.*2d 1021 (1994) (application for benefits under Aid to Families with Dependent Children—Unemployed Parent program); *Shovelin v. Cent. N.M. Elec. Coop., Inc.,* 115 *N.M.* 293, 850 *P.*2d 996 (1993) (breach of contract and retaliatory discharge); *Shelton v. Oscar Mayer Foods Corp.,* 325 *S.C.* 248, 481 *S.E.*2d 706 (1997) (wrongful discharge); *Harrilal v. Blackwood,* 44 *V.I.* 144, 2001 *WL* 1769735 (2001) (wrongful discharge).

We can discern no principled reason to resist that great weight of authority. Therefore, we hold that collateral estoppel effect is to be denied to unemployment compensation determinations principally for the rationales so clearly expressed in *Rue v. K–Mart Corp.*, 552 *Pa.* 13, 713 *A.*2d 82 (1998): because of their procedural limitations (their informality and lesser safeguards) and their different purposes (to provide speedy and inexpensive unemployment benefits), unemployment compensation proceedings do not afford litigants a full and fair opportunity to litigate factual issues sufficient to warrant collateral estoppel effect.

### IV.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.