991 A.2d 233 (2010)
412 N.J. Super. 389
DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
R.D., Defendant-Appellant.
In the Matter of the Guardianship of K.D. and R.D.,[1] Minors.
A-4478-07T4
Superior Court of New Jersey, Appellate Division.
Argued January 6, 2010.
Decided February 9, 2010.
*234 Thomas G. Hand, Designated Counsel, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Hand, on the brief).
Lisa J. Godfrey, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Godfrey, on the brief).
Lisa M. Black, Designated Counsel, argued the cause for minors K.D. and R.D. (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Ms. Black, on the brief).
Before Judges GRAVES, SABATINO and NEWMAN.
The opinion of the court was delivered by
NEWMAN, J.A.D. (retired and temporarily assigned on recall).
Defendant, R.D., appeals from the termination of his parental rights to K.D. and Ry.D., the two youngest of his five children. In a prior proceeding, the court found that defendant had engaged in improper sexual relations with his oldest daughter, S.D., and was guilty of abuse and neglect as to all five children. The guardianship court subsequently found that the Division of Youth and Family Services (DYFS) had proven by clear and convincing evidence each of the four prongs of the best interests of the child standard set forth in N.J.S.A. 30:4C-15.1(a) and terminated his parental rights. We now affirm.
Both Judge Harold Johnson, in the abuse or neglect proceeding under Title 9, and Judge Darrell Fineman, in the guardianship trial under Title 30, rendered lengthy decisions with extensive findings of facts and conclusions of law. We, therefore, find it unnecessary to trace the extended procedural and factual history of this matter, except as follows.
Defendant and L.D. were married and had four children: S.D., born in 1988; H.D., born in 1990; Sh.D., born in 1992; and K.D., born in 1998. Defendant was the stepfather of L.D.'s two older daughters: D.N., born in 1978, and M.N., born in 1982. Defendant also had a child with L.B., Ry.D., born in 1999.[2]
In the abuse or neglect trial, Judge Johnson, in his fifty-four page decision of May 2, 2005, found by clear and convincing evidence that defendant had engaged in wrongful sexual relations with S.D., that the sexual contact began prior to S.D.'s sixteenth birthday, and that this behavior was abuse and neglect as to S.D. He further found that defendant was guilty of abuse and neglect because his behavior "placed the physical, mental and emotional health of all of the children in imminent danger of being impaired as a result of [defendant] failing to exercise a minimum degree of care by exposing all the children to his inappropriate sexual contact with S.D."
The court based its decision on the initial statements by the four younger children *235 that their father slept on the couch with S.D., the initial statements by Sh.D. that she heard S.D. crying in the living room at night and telling her father to "stop," and the statements by the children that S.D. generally served as a "parental figure." The court noted that S.D.'s refusal to allow a genital examination implicated a guilty conscience on her part and guilt on defendant's part.
The court ordered the children's removal and placed them under the continued care, custody, and supervision of DYFS, with Sh.D., H.D., and Ry.D. to remain in foster care, and S.D. with her paternal grandmother. It further directed S.D. and Sh.D. to attend psychological counseling and H.D., K.D., and Ry.D. to be provided with a DYFS worker. The court also granted the parents weekly supervised visitation.
No appeal was taken from the court's final decision.
At DYFS's request, Maryann F. McLaughlin, Psy.D., a clinical psychologist, evaluated defendant and, in a report dated September 20, 2005, described him as attentive and cooperative but defensive and guarded. She noted that his IQ score was eighty-six, in the low average range, that he demonstrated some "ineffective interpersonal behavior," but that he was able to function in society by having a job and a home and caring for his children in a stable situation. Based on information provided by defendant and his test results, McLaughlin recommended a parenting assessment and individual therapy to help him develop better interpersonal skills.
After submitting her initial report, McLaughlin received new information concerning defendant's background, including the court's finding of abuse and neglect. In an addendum dated November 30, 2005, McLaughlin concluded that defendant had lied during his interview and had failed to accept responsibility for any negative behavior. Based on his "behavior as a pedophile and his refusal to admit to his actions," she recommended that he "immediately begin intensive therapy in a specialized program for pedophiles." McLaughlin also determined that defendant should not be allowed to see his children until he accepted responsibility, and that there should be careful monitoring, if visitation resumed. She withdrew her prior recommendation for a parenting evaluation.
On December 22, 2005, January 5, 2006, and February 8, 2006, defendant met with Barbara A. Brown, a licensed clinical social worker, for psychotherapy sessions in a specialized program for pedophiles. In her report dated February 28, 2006, Brown found that defendant had demonstrated an inability to parent children and that his defensiveness and denial regarding the sexual abuse allegations made sex offender specific treatment impossible at that time. She recommended that a thorough sex offender evaluation should be considered before any decisions were made regarding the children.
Jennifer Kelly, Ph.D., a licensed psychologist, saw defendant for a psychosexual evaluation on July 5, 2006. After interviewing him and administering psychological tests, she found that defendant was manipulative, dishonest, desperate for the return of his children, and unwilling to take responsibility for his previous sexually inappropriate behavior. Kelly recommended that defendant have no contact with his children and no unsupervised contact with any children as long as he remained in denial. She further recommended that defendant be reconsidered for sex specific treatment in the future if he became more amenable to treatment.
*236 Defendant's substance abuse evaluation showed that he did not meet the criteria for treatment.
The trial regarding the termination of parental rights commenced in December 2007 before Judge Fineman. Neither biological mother participated in the trial.
DYFS proposed to place K.D. and Ry.D. in select home adoption where families were interested in permanency and adoption instead of serving as temporary residences for children. At the time, these children were living in separate foster homes. K.D.'s foster parents were not interested in adoption, and Ry.D.'s foster mother was not certain. Lisa Puhala, a DYFS adoption worker, testified that both children were thriving but that K.D. had problems with defiance issues and was sexually acting out. Ry.D. had impulse control issues.
DYFS did not believe L.D. or L.B. were capable of parenting the children and did not consider defendant because he never complied with sex offender specific counseling. Puhala acknowledged on cross-examination that, from 1999 to 2004, defendant took care of these children in a "well-fashioned, disciplined, organized manner," that he complied with DYFS's requests for services, which then were terminated, and that it did not receive any reports of children missing school or of abuse during that time. She also acknowledged that DYFS placed these children in defendant's custody, even though it was aware of his guilty plea to a prior charge of endangerment for serving alcohol to minors. She further acknowledged that defendant did not have an alcohol or substance abuse problem, and that his psychological and parenting evaluations did not suggest anything objectionable.
At DYFS's request, Linda Jeffrey, Ph. D., a psychologist, conducted a psychological evaluation of defendant during two sessions in October 2006 and January 2007. She also conducted bonding evaluations of defendant and his four children, excluding S.D., in July 2007.
The purpose of the psychological evaluation was to assess mental health status and parenting capacity. Jeffrey described defendant as "frequently irritable, hostile, uncooperative, and reticent to provide information." Defendant told her that he was living with his then eighteen-year-old daughter, whom she understood was S.D., that he had worked at a truck stop for eight or nine years "until DYFS got me fired," and that he had been unemployed for a year while he continued to work at "side jobs." Jeffrey administered a series of psychological tests, measuring intelligence, reasoning, academic skills, personality, and substance abuse. Defendant refused to take the initial test to determine his reading level, did not complete the personality assessment test, and scored in the third percentile in overall academic skills. Based on the test results, Jeffrey found defendant had low-level depression, an unspecified learning disability, problems relating to social interactions, and serious mental health problems which decreased his parenting capacity. She believed it would be difficult for defendant to provide a safe level of parenting and did not recommend the return of his children.
The purpose of the bonding evaluation was to assess the attachment of the children to the parent. At the time of Jeffrey's evaluation, defendant had not seen his children for at least eight months. After observing defendant with H.D., Sh.D., K.D., and Ry.D., Jeffrey found the children were all friendly, but she believed they had an "insecure attachment" to their father, meaning there was affection but the children did not view defendant as essential to their sense of security. Jeffrey also observed that defendant had the *237 older two girls act as "parents" in terms of the discipline of the younger children, and after they left, it became more difficult for him to watch K.D. and Ry.D., as their behavior deteriorated. She believed termination of defendant's parental rights would cause some harm but not serious or enduring harm, and Jeffrey did not recommend that the children return to his care.
Defendant testified at the guardianship trial, stating that before DYFS removed his children, he left the house each day around 6:00 a.m. to catch the bus for work and returned around 5:30 p.m. The children attended school every day, and then went to their grandmother's, who lived "[r]ight down the road," until he got home from work. Defendant testified that he did all the cooking and washing and the children helped. He also took them to the doctors.
After DYFS removed his children, defendant went for alcohol testing and psychological counseling, but he said DYFS never sent him for drug tests or asked him to get sexual abuse treatment. Defendant also went to a bonding session even though he was having back problems, stating Sh.D. and H.D. tried to help him at the session by watching Ry.D., whom he described as always "a little wild" or hyperactive.
Before the court suspended his visitation rights, defendant said the visits "went fine" except that DYFS workers always argued with him and told the children not to listen to him. He said the children were happy to see him, explaining that "[t]hey jumped on me and hugged me and everything, you know. There was nothing wrong with my kids until they kept poking at them." Because the visits took place during the day, defendant was purportedly fired from his job at the truck stop.
At the time of trial, defendant worked at a gas station. He lived with S.D., who worked at an Acme store. They both worked a mid-afternoon to late-evening shift, and then, defendant would pick up S.D. after work and drive home.
In a fifty-eight page decision, Judge Fineman found that the same issue of sexual abuse and its impact on the children was fully litigated in the Title 9 action before Judge Johnson, that all the elements of collateral estoppel were met, and that none of the exceptions applied. Judge Fineman incorporated Judge Johnson's fact findings into his opinion.
Judge Fineman concluded that the State established each element of the best interests of the child standard set out in N.J.S.A. 30:4C-15.1. He found that defendant had sexually abused S.D., that K.D. and Ry.D. had been exposed to the sexual abuse, and he believed it would be "folly" to leave the children in defendant's care because of the likelihood that harm would be visited upon them in the future. Judge Fineman also found that defendant was unwilling and unable to eliminate the harm to his children because he had not treated his pedophilia, that there was no alternative to parental termination, and that termination of defendant's rights would not cause more harm than good. The court terminated the parental rights of defendant, L.D., and L.B., and awarded guardianship to DYFS.
On appeal, defendant raises the following issues for our consideration:
POINT I
THE TRIAL COURT ERRED IN APPLYING COLLATERAL ESTOPPEL TO INCORPORATE JUDGE JOHNSON'S FINDINGS FROM THE FACT FINDING HEARING AGAINST [R.D.] IN THE GUARDIANSHIP PROCEEDING.
A. Collateral Estoppel Cannot be Used to Interchange Findings *238 Between Abuse-or-Neglect Proceedings and Guardianship Proceedings.
B. Mis-Application of Olivieri Standards.
C. Mis-Application of V.K.

POINT II
BOTH TRIAL COURTS RELIED ON UNRELIABLE INCOMPETENT EVIDENCE TO SUPPORT THEIR FINDINGS OF FACT.
A. The Prior charges.
B. [Sh.D.'s] Allegations.
C. Judge Johnson's Interview Of The Children.
POINT III
DYFS FAILED TO ESTABLISH ALL OF THE ELEMENTS OF N.J.S.A. 30:4C-15.1.
A. DYFS Failed to Prove Harm to [K.D.] or [Ry.D.].
B. [R.D.] Provided a Safe and Stable Home.
C. DYFS did not Provide Reasonable Services and the Trial Court Failed to Consider Alternatives to Termination.
D. DYFS Did Not Prove that Terminating Rights Would Not Do More Harm Than Good.
We address the issues in the order raised above.

I.
Defendant contends the court erred by adopting the findings in the Title 9 action that he abused or neglected his children and incorporating them against him in the guardianship trial. He argues that the court misapplied the doctrine of collateral estoppel to bar relitigation of the issue of abuse under the best interests of the child standard; ignored the exceptions to the general rule; and misinterpreted case law requiring separate litigation where proceedings required different standards of proof. He also argues that the fact finding decision in the Title 9 action was improper.
At the conclusion of the trial in the Title 9 action, Judge Johnson found that defendant engaged in ongoing and wrongful sexual contact with S.D. which began prior to her sixteenth birthday in violation of N.J.S.A. 2C:14-2(a)(2)(a) and continued after her sixteenth birthday in violation of N.J.S.A. 2C:14-2 (c)(3). The judge also found that this illegal sexual behavior was abuse and neglect as to S.D. in violation of N.J.S.A. 9:6-8.21(c)(3) and that this behavior placed the children's physical, mental, and emotional health "in imminent danger of being impaired as a result of [defendant] failing to exercise a minimum degree of care" in violation of N.J.S.A. 9:6-8.21(c)(4). He further found that the sexual behavior as to S.D. placed her at risk of pregnancy, which "could have therefore resulted in a substantial and ongoing risk of physical injury" in violation of N.J.S.A. 9:6-8.21(c)(2).
Judge Johnson found that defendant violated these statutes by clear and convincing evidence and that defendant was "guilty of abuse and neglect as to all five children by this evidential standard." He explained:
[t]he evidence as presented and as described above, along with the totality of the circumstances as listed, give this court a firm belief and conviction that the allegations so listed and proven by the State are true. The court finds that the evidence is so clear, direct, and weighty in terms of quality and is so convincing that the court does come to a clear conviction of the truth of the precise facts in issue. The court hereby finds that the evidence presented is far more than a mere balancing of doubts and probabilities and that there is clear *239 evidence before it[,] so that the court is convinced that the allegations sought to be proven as stated and reviewed above are true.
He further recognized that a finding by clear and convincing evidence had serious consequences in a family neglect action and that it arguably satisfied "the first prong of the four part test the State must satisfy to terminate a parent's rights as to a child under N.J.S.A. 30:4C-15.1(a)."
DYFS subsequently filed a motion seeking to apply collateral estoppel to foreclose relitigation of the issues of abuse. The Law Guardian joined in the motion. In May 2007, Judge Fineman granted the application, stating:
[t]he Court bars the re-litigation of the sexual abuse of the children's sibling and the findings made by the trial court that this abuse placed the physical, mental and emotional health of the children in imminent danger of being impaired as a result of [defendant's] failing to exercise a minimum degree of care by exposing all the children to his inappropriate sexual contact with the children's sibling.
Abuse or neglect proceedings are brought under Title 9, N.J.S.A. 9:6-8.21 to -8.73. Upon the filing of a complaint alleging abuse and neglect, N.J.S.A. 9:6-8.47 provides for a fact-finding hearing followed by a dispositional hearing. The disposition order is considered final and, therefore, is appealable "as of right." N.J.S.A. 9:6-8.70; N.J. Div. of Youth & Family Servs. v. A.P., 408 N.J.Super. 252, 262, 974 A.2d 466 (App.Div.2009); N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J.Super. 155, 164, 814 A.2d 656 (App. Div.2003). Defendant did not appeal Judge Johnson's disposition order of May 5, 2005, following his finding of abuse and neglect. Thus, there is no basis to set aside his decision.
Defendant next argues that the court erred by applying collateral estoppel to allow DYFS to use the fact finding from the Title 9 action to prove the first prong of the best interests of the child standard. He specifically argues that the court improperly allowed DYFS to use the finding of abuse of S.D. to support a finding of harm to K.D. and Ry.D.
Collateral estoppel bars a party from relitigating any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action, where the burden of proof is the same. In re Coruzzi, 95 N.J. 557, 567, 472 A.2d 546, appeal dismissed, 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 8 (1984); B.F. v. Div. of Youth & Family Servs., 296 N.J.Super. 372, 389, 686 A.2d 1249 (App.Div.1997). To determine if collateral estoppel applies, the court must consider whether:
(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
[Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 521, 897 A.2d 1003 (2006) (quoting In re Estate of Dawson, 136 N.J. 1, 20-21, 641 A.2d 1026 (1994)).]
Although collateral estoppel is not mandated by constitution or statute, it serves important policy goals such as "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness[.]" First Union Nat'l Bank v. Penn Salem *240 Marina, Inc., 190 N.J. 342, 352, 921 A.2d 417 (2007) (quoting City of Hackensack v. Winner, 82 N.J. 1, 32-33, 410 A.2d 1146 (1980)). Even where the requirements are met, a court will not apply this doctrine when it would be unfair to do so. Olivieri, supra, 186 N.J. at 521-22, 897 A.2d 1003.
"Abuse[ ]or[ ]neglect and termination proceedings are brought under separate statutory schemes, require different burdens of proof, and allow for different remedies." N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 555, 643 A.2d 987 (1994). N.J.S.A. 9:6-8.21(c) defines an "abused or neglected child" in relevant part as
a child less than 18 years of age whose parent ... (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; (3) commits or allows to be committed an act of sexual abuse against the child ... (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent ... to exercise a minimum degree of care[.]
On a determination of abuse or neglect, N.J.S.A. 9:2-18 allows agencies to file a complaint in the Superior Court seeking the termination of parental rights. K.M., supra, 136 N.J. at 556, 643 A.2d 987.
Among the five separate statutory grounds for filing a guardianship petition is a finding of abuse or neglect in an action under Title 9. N.J.S.A. 30:4C-15(a); A.P., supra, 408 N.J.Super. at 259, 974 A.2d 466. While DYFS may bring an action to terminate parental rights without a prior finding of abuse or neglect, it generally first brings a Title 9 action, "at least in cases where there is a realistic possibility that a child removed from the parents' home because of alleged abuse or neglect may return to the home with the assistance of DYFS's remedial services." A.P., supra, 408 N.J.Super. at 260, 974 A.2d 466.
N.J.S.A. 30:4C-15.1 requires DYFS to file for guardianship by instituting a termination proceeding when such action would be in the child's best interest. The State must prove, under the first prong of the best interests test, that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1).
When there is an adjudication of abuse or neglect in a Title 9 action and a final order of disposition is entered, this court has recognized that the final order might have "continuing `adverse consequences' for a parent who has been found to have abused or neglected his or her child." A.P., supra, 408 N.J.Super. at 262, 974 A.2d 466. Indeed, "a finding in an action under Title 9 that a parent has abused or neglected his child may be admissible in an action under Title 30 for the termination of parental rights." Ibid.
While DYFS has the burden of establishing abuse or neglect in a fact-finding hearing by a preponderance of the evidence, N.J.S.A. 9:6-8.46(b)(1), the burden of proof in a Title 30 termination case is the clear and convincing evidence standard. K.M., supra, 136 N.J. at 557, 643 A.2d 987; A.P., supra, 408 N.J.Super. at 264, 974 A.2d 466. When the underlying finding of abuse, however, is made by clear and convincing evidence and not merely by a preponderance of the evidence, it may support a termination of parental rights. N.J. Div. of Youth & Family Servs. v. V.K., 236 N.J.Super. 243, 261, 565 A.2d 706 (App.Div.1989), certif. denied, 121 N.J. 614, 583 A.2d 315 (1990).
*241 In V.K., DYFS brought a complaint for custody of the defendants' children, alleging abuse and neglect. Id. at 249, 565 A.2d 706. During the custody hearing, DYFS amended the pleadings to petition for termination of parental rights. Ibid. The court found the allegations in the custody proceeding were supported by a preponderance of the evidence but concluded that DYFS did not show by clear and convincing evidence that the defendants' parental rights should be terminated. Ibid. DYFS appealed, and we remanded, ordering among other things that the court take the children's testimony, after which the trial court terminated parental rights. Id. at 250, 565 A.2d 706.
On appeal, the defendant-father argued that the trial court erred by terminating his parental rights when the underlying finding of abuse was made by a preponderance of the evidence. Id. at 260, 565 A.2d 706. This court agreed, holding that the higher standard of clear and convincing evidence must be applied to the underlying basic finding to support the decision to terminate. Id. at 261-62, 565 A.2d 706. We reversed and remanded for the trial court to determine if DYFS proved its allegations of child abuse by clear and convincing evidence, not the preponderance of the evidence standard as originally found. Id. at 263, 565 A.2d 706.
Unlike V.K., the court in the abuse or neglect proceeding here applied the higher standard of clear and convincing evidence to determine that defendant sexually abused S.D. and that this behavior placed the physical, mental, and emotional condition of all the children in imminent danger of being impaired. Because the State proved its allegation of sexual abuse by the higher standard in the Title 9 action, Judge Fineman properly used this finding to support the decision to terminate.
The fact finding in the abuse or neglect proceeding satisfied the first prong of the best interests standard in the termination proceeding. All of the requirements for collateral estoppel applied to bar relitigation: the issue of sexual abuse was identical to the issue in the prior proceeding; the issue of abuse and its impact on the children was in fact litigated in the Title 9 action; defendant could have appealed the prior finding after Judge Johnson entered the disposition order; the determination of this issue was essential to the entry of judgment in the Title 9 action; and the parties essentially were identical. Coruzzi, supra, 95 N.J. at 567, 472 A.2d 546; see also In re Guardianship of J.O., 327 N.J.Super. 304, 309-10, 743 A.2d 341 (App. Div.) (holding the appellant's convictions for raping his children collaterally estopped him from claiming his innocence at parental termination proceedings, because the factual questions were identical), certif. denied, 165 N.J. 492, 758 A.2d 651 (2000).
Moreover, defendant does not argue that he lacked a full and fair opportunity to litigate this issue in the prior action. See Delbridge v. Schaeffer, 238 N.J.Super. 323, 331-32, 569 A.2d 872 (Law Div.1989) (finding collateral estoppel applied to bar the plaintiffs from challenging the defendants' decision to remove their children, because the decision was already the subject of two prior family court actions, and there was nothing to suggest the plaintiff-father did not have a full and fair opportunity to voice his complaints), aff'd sub nom., A.D. v. Franco, 297 N.J.Super. 1, 687 A.2d 748 (App.Div.1993), certif. denied, 135 N.J. 467, 640 A.2d 849, cert. denied sub nom., Delbridge v. Franco, 513 U.S. 832, 115 S.Ct. 108, 130 L.Ed.2d 56 (1994).
Furthermore, to the extent that defendant claims he was not alerted to the fact that the court in the abuse or neglect trial could make a finding by the higher standard *242 of clear and convincing evidence, he is mistaken. Judge Johnson indicated as much in the trial. Additionally, the disposition order utilized in these proceedings contains two separate check-off boxes: one for the preponderance of the evidence standard and the other for the clear and convincing evidence standard of proof. Defendant should have been well aware of the consequences of a potential determination by the higher proof standard. The fact that he may have ignored that consequence from occurring does not mean he was not noticed that it could happen.
Contrary to defendant's assertions, the guardianship court did not fail to correctly apply the exceptions to collateral estoppel. See Olivieri, supra, 186 N.J. at 523, 897 A.2d 1003 (listing five exceptions to the general rule of issue preclusion). First, defendant makes this argument without any citation to the record. It is not our province to substantiate his argument. State v. Hild, 148 N.J.Super. 294, 296, 372 A.2d 642 (App.Div.1977). Instead, defendant reiterates his argument that Judge Johnson's fact finding was not a final judgment that carried a right to appeal. As already discussed, the disposition order was appealable. N.J.S.A. 9:6-8.70. Second, Judge Fineman thoroughly considered and analyzed the exceptions to the application of collateral estoppel and concluded that none of them applied. Defendant fails to provide any example to support his argument to the contrary.
Finally, defendant mistakenly relies on N.J. Division of Youth & Family Services v. I.Y.A., 400 N.J.Super. 77, 90-93, 946 A.2d 62 (App.Div.2008), to argue that the abuse or neglect proceeding and guardianship trial violated recent case law regarding hearsay evidence. In I.Y.A., this court concluded that there was insufficient evidence to sustain the trial court's determination that the defendant abused or neglected her children. Id. at 89, 946 A.2d 62. There, the only witnesses to testify at the fact-finding hearing were two DYFS caseworkers. Id. at 86, 946 A.2d 62. DYFS did not produce a psychological evaluation of the defendant-mother, and the unidentified psychologist did not testify at the fact-finding hearing. Id. at 91, 946 A.2d 62. Nor did DYFS present any expert testimony or proffer an expert medical report with respect to the defendant-mother's diagnosis. Id. at 93, 946 A.2d 62. On that record, we concluded that the defendant-mother was entitled to a new fact-finding hearing, and that an evidentiary hearing must be held prior to a transfer of custody to the children's father. Id. at 96, 946 A.2d 62.
Unlike I.Y.A., Jeffrey, who administered psychological tests to defendant in the course of a psychological evaluation and conducted bonding evaluations of defendant to H.D., Sh.D., K.D., and Ry.D., testified at the guardianship trial. DYFS presented expert testimony to support its termination action. The record absent in I.Y.A. was present here.
We are satisfied that Judge Fineman properly employed collateral estoppel by adopting Judge Johnson's finding by clear and convincing evidence that defendant committed sexual abuse of S.D. when she was in his care and the other children were in the household.
At the direction of the court per Rule 1:36-2(a), the discussion of the issues in Sections II and III in the appeal have been omitted from the published version of the opinion.
The order terminating R.D.'s parental rights to K.D. and Ry.D. is affirmed.
NOTES
[1] Because the father and son have the same initials, we will refer to the son as Ry.D. in this opinion.
[2] L.D. also had three sons. Both L.D.'s and L.B.'s parental rights to K.D. and Ry.D. were respectively terminated. Neither L.D. nor L.B. have appealed, and consequently, we will not address the termination of their parental rights.