**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2401-18T2

MELVIN REID and MARYLYNN
REID, Husband and Wife,

      Plaintiffs-Respondents,

v.

NEW JERSEY MANUFACTURERS
INSURANCE COMPANY,

      Defendant-Appellant.

_____

Argued November 4, 2019 – Decided February 27, 2020

Before Judges Sabatino, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-0610-18.

Stephen J. Foley, Jr., argued the cause for appellant (Campbell, Foley, Delano & Adams, LLC, attorneys; Mario John Delano and Stephen J. Foley, Jr., on the briefs).

Daniel M. Santarsiero argued the cause for respondents (Law Offices of Jonathan F. Marshall, attorneys; Daniel M. Santarsiero, on the briefs).

PER CURIAM

Defendant New Jersey Manufacturers Insurance Company (NJM) appeals from an August 31, 2018 order granting partial summary judgment to plaintiffs Melvin and Marylynn Reid. After considering the record against the relevant legal principles and applicable standard of review, we reverse.

I.

Jonathan Radcliffebivins was operating a motor vehicle when he collided with a car operated by Marc Reid in which his father, Melvin, was a passenger. The vehicle Radcliffebivins was operating was insured by the Government Employees Insurance Company (GEICO) with $20,000 in liability limits. The vehicle that Marc was driving was owned by his then wife Maria A. Menio-Reid and was insured by defendant NJM which provided, among other coverages, $300,000 in underinsured motorist[1] (UIM) insurance.[2] Melvin did not reside with Marc or his wife and was

---

[1] A tortfeasor is an underinsured motorist when possessing "'less' coverage 'at the time of the accident' than the person seeking UIM benefits. The comparison of policy limits required by N.J.S.A. 17:28-1.1(e) is determined by the 'actual tortfeasor's policy limits and not by the settlement amounts paid to the injured party.'" Harmon v. N.J. Auto. Full Ins. Underwriting Ass'n, 268 N.J. Super. 434, 438 (App. Div. 1993) (quoting Gold v. Aetna Life & Cas. Ins. Co., 233 N.J. Super. 271, 277 (App. Div. 1989)).

[2] The parties have not included the declarations sheet to the NJM policy in the record, nor a complete copy of the NJM policy. They do not dispute, however,

not a named insured on the NJM policy. Melvin was insured by an Allstate Insurance Company (Allstate) policy that contained $100,000 in per person UIM limits.

In November 2014, plaintiffs filed a complaint in the Law Division against Radcliffebivins for injuries sustained by Melvin in the accident. Plaintiffs also notified Allstate and NJM shortly thereafter of the action and advised those insurers that they sought UIM benefits. Plaintiffs further advised Allstate and NJM of the companies' attendant rights to intervene in the proceedings. Allstate so exercised that right but NJM did not participate in the plaintiffs' personal injury action and advised plaintiffs that its exposure was limited based on section A.2 of the Limits of Liability section of the NJM policy.

Section A.2 provides coverage for both uninsured motorist (UM) and UIM incidents subject to applicable coverage limits and conditioned on the following:

> Limit of Liability
>
> A. The limit of liability shown in the declarations for this coverage is our maximum limit of liability for all damages resulting from any one accident. However, subject to our maximum limit of liability for this coverage:

---

that the policy included $300,000 in UIM benefits. Further, no party has challenged the insured status of plaintiff Melvin Reid. We assume from their arguments, however, that he was neither a named insured nor family member.

> 2. If an insured is not a named insured or family member under this policy, then [NJM's] maximum limit of liability for that insured, for all damages resulting from any one accident, <u>shall not exceed the minimum limits required by New Jersey law for liability coverage set forth in N.J.S.A. 39:6A-3</u>.
>
> [(Emphasis supplied).]

N.J.S.A. 39:6A-3 provides that the minimum coverage limit for "injury to, or death of, one person, in any one accident" is $15,000.[3]

Radcliffebivins offered to settle with plaintiffs for the $20,000 liability limit in the GEICO policy. In accordance with <u>Longworth v. Van Houten</u>, 223 N.J. Super. 174 (App. Div. 1988), plaintiffs notified Allstate and NJM of the settlement offer and sought their consent to settle. Allstate authorized the settlement, but NJM again indicated that because Radcliffebivins' liability limits exceeded the UIM limits under the step-down clause, plaintiffs were precluded from recovery against NJM.

A jury returned a verdict for plaintiffs against Allstate, finding that the collision caused $1,250,000 in damages to Melvin and $50,000 in per quod damages to Marylynn. As a result of the jury's verdict, Allstate disbursed the remaining $80,000 of available UIM coverage under its policy.

---

[3] N.J.S.A. 39:6A-3 further prescribes a minimum coverage limit for "injury to, or death of, more than one person, in any one accident" of $30,000, N.J.S.A. 39:6A-3(b), and $5000 for "damage to property in any one accident." N.J.S.A. 39:6A-3(c).

A-2401-18T2

Shortly thereafter, plaintiffs filed a two-count complaint against NJM, alleging that it: 1) was bound by the February 8, 2018 verdict, and 2) wrongfully denied insurance benefits to plaintiffs in violation of its duty of good faith and fair dealing. With respect to count one, plaintiffs sought the $300,000 in UIM benefits under the NJM policy.

The parties cross-moved for summary judgment on count one. Plaintiffs argued that NJM should not be permitted to "re-litigate the jury award" against Allstate because "it is undisputed that [NJM] was on notice of the underlying litigation," yet chose not to intervene. Further, plaintiffs contended that NJM was bound by our unpublished decision in Granata v. Rasizer, No. A-1855-14T2 (App. Div. May 19, 2016), certif. denied, 227 N.J. 358 (2016),[4] as it was a party to that litigation.

In Granata, the plaintiff was injured in an automobile accident while driving her mother's car. Granata, slip op. at 1. The vehicle was insured by NJM, and the plaintiff was not a named insured on the policy. Ibid. Plaintiff filed a claim

---

[4] Generally, "no unpublished opinion shall be cited by any court," Rule 1:36-3, except where, as here, the unpublished decision is submitted for the limited purposes of "the application of preclusionary legal principles or case history . . . ." Pressler and Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:36-3 (2020); see also Animal Prot. League of N.J. v. N.J. Dep't of Envtl. Prot., 423 N.J. Super. 549, 556 n.2 (App. Div. 2011).

with NJM for UIM benefits "pursuant to [the plaintiff's mother's] belief that NJM provided her with up to $300,000 in UIM benefits." Ibid.

NJM denied the claim because the prior year, the policy had been amended to include a step-down provision[5] that limited the available UM/UIM coverage for non-resident relatives to $15,000. Ibid. NJM alleged that plaintiff's mother had been made aware of the step-down clause in a "summary of important changes" sent to her prior to the policy renewal that stated her UM/UIM coverage "had been reduced 'to the lowest level allowed by New Jersey law.'" Id. at 1, 4. Plaintiff's mother testified at her deposition that she did not read the summary, but that when she contacted NJM, she was told her coverage had not changed. Id. at 2. The trial court granted summary judgment to NJM. Ibid.

We reversed and concluded that the UIM step-down provision in that case was ambiguous because neither the summary, the declaration sheet, nor the policy itself "indicate[d] the amount of available coverage for a non-resident relative," as the policy contained only a reference to N.J.S.A. 39:6A-3. Id. at 4. We rejected NJM's argument that a policyholder should conduct research or consult with a lawyer to determine the minimum liability limits and stated:

> The need to consult a lawyer suggests, on its face, the impermissible ambiguity that we and our Supreme

---

[5] The step-down clause in Granata is identical to section A.2.

Court have consistently proscribed. Even if a policyholder had gone to a library and found N.J.S.A. 39:6A-3, that section would not provide the requisite clarity for a lay policyholder, as it does not mention UM or UIM coverage specifically, and gives three different numbers for different types of coverage.

[Ibid.]

Instead, relying on Zacarias v. Allstate Ins. Co., 168 N.J. 590 (2011), we reasoned that:

[i]n enforcing an insurance policy, courts will depart from the literal test and interpret it in accordance with the insured's understanding, even when that understanding contradicts the insurer's intent, if the text appears overly technical or contains hidden pitfalls, cannot be understood without employing subtle or legalistic distinctions, is obscured by fine print, or requires strenuous study to comprehend.

[Ibid. (quoting Zacarias, 168 N.J. at 601) (citations omitted).]

We also noted that NJM renews coverage regularly and could "easily add a number . . . to plaintiff's contract." Ibid. As such, we determined that "[t]he mere citation of a statute is not enough to inform the average policy holder of what those limits are," ibid., and "the minimum liability coverage limit of $15,000 should have been specifically included in the policy to allow . . . the policy holder[] to 'digest the changes' of the policy." Ibid. (quoting Skeete v. Dorvius, 184 N.J. 5, 9 (2005)).

As it does before us, NJM maintained in the trial court that section A.2 was clear and unambiguous and distinguished Granata by noting that the Granata court addressed a situation involving improperly communicated changes in coverage as opposed to the present circumstance where the insured "is getting exactly what he negotiated, exactly what he paid for when he took the insurance in the first place."

In an August 31, 2018 oral decision, the court granted plaintiffs' motion, denied NJM's cross-motion, and entered a conforming order granting judgment to plaintiffs for $200,000.[6] In its oral decision, the court concluded that NJM was bound by the Granata decision as it was a party to that litigation. The court reasoned that Granata was "sufficiently similar to the present case" because neither policy's UIM provision contained "an explicit dollar value, and instead [consisted of] a reference to a statute which is not known to the average insured." The court deemed it irrelevant "[w]hether the alleged ambiguity was always present . . . or introduced during coverage."

Finally, the court noted that even if it did not consider Granata, it would nevertheless have found the step-down clause "ambiguous and . . . properly

---

[6] The judgment was comprised of the difference between the $300,000 UIM policy limit covering Menio-Reid's vehicle, and the $100,000 disbursed by GEICO and Allstate.

A-2401-18T2

interpreted against the insurer." The court explained that "a step[-]down provision that . . . [cites] a statute, rather than an easily digestible dollar amount, is confusing" and, as such, refused to "enforce a provision that is so . . . confusing that the average policyholder cannot make out the boundaries of coverage . . . ."

NJM moved for reconsideration or to amend the order pursuant to Rule 1:7-4 (b), requesting that the court consider another section of its policy "which would afford . . . plaintiff[s] coverage," but would provide less than $300,000 in UIM benefits. In response, plaintiffs filed a cross-motion to enforce litigant's rights pursuant to Rule 1:10-3, asserting that NJM had neither relied upon, nor mentioned, any other provision of the policy other than section A.2, and had failed to supply answers to an information subpoena. The court issued an October 17, 2018 order granting plaintiffs' cross-motion and denying NJM's motion.

Plaintiffs moved to certify the partial summary judgment order as final, pursuant to Rules 4:42-2 and 4:59, which the court granted on January 18, 2019. This appeal followed.

NJM advances two arguments on appeal. First, it contends the court incorrectly concluded that NJM was bound by our unpublished decision in Granata simply because it was a party to that case. Second, NJM maintains the court

mistakenly determined that that NJM's step-down clause was vague and unenforceable.

II.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Townsend v. Pierre, 221 N.J. 36, 59 (2015). "Summary judgment must be granted if 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment . . . as a matter of law.'" Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting R. 4:46-2(c)). We accord no special deference to the trial judge's conclusions on issues of law. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

Initially, we conclude that NJM was not collaterally estopped from relying on the step-down provision contained in section A.2 of its policy based on our decision in Granata. Collateral estoppel "bars relitigation of issues previously litigated and determined adversely to the party against whom the doctrine is asserted . . . . When used to bar a defendant from asserting a defense previously litigated and lost against a different plaintiff[,] it is referred to as offensive collateral estoppel." Kortenhaus v. Eli Lilly & Co., 228 N.J. Super. 162 (App.

Div. 1988). For a court to determine that a party is collaterally estopped from litigating an issue, five elements must be met:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [Allen v. V & A Bros., Inc., 208 N.J. 114, 137 (2011) (quoting Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 521 (2006)).]

Under the first prong, the prior action must have involved substantially similar or identical issues. L.T. v. F.M., 438 N.J. Super. 76, 86 (App. Div. 2014) (quoting Olivieri, 186 N.J. at 521). Some courts have required the issues to be "precisely the same." In re Liquidation of Integrity Ins. Co./Celotex Asbestos Trust, 214 N.J. 51, 68 (2013) (quoting In re McWhorter, 887 F.2d 1564, 1567 (11th Cir. 1989)).

Further, an "issue is actually litigated" if the issue "is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." Allesandra v. Gross, 187 N.J. Super. 96, 105-06 (App. Div. 1982) (quoting Restatement (Second) of Judgments § 27, cmt. d (Am. Law. Inst. 1980)). Moreover, "'final judgment' includes any prior adjudication of an issue in

11

another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) of Judgments § 13. "Simply put, for collateral-estoppel purposes, 'the question to be decided is whether a party has had his day in court on an issue.'" State v. K.P.S., 221 N.J. 266, 278 (2015) (quoting McAndrew v. Mularchuk, 38 N.J. 156, 161 (1962)).

Plaintiffs urge that NJM, having had a robust opportunity to defend section A.2 against ambiguity challenges in Granata, should be precluded from relitigating that issue. Indeed, the ambiguity issue appears to have been "identical,"[7] "actually litigated" to finality, see Allen, 208 N.J. at 137 (quoting Olivieri, 186 N.J. at 521); Restatement (Second) of Judgments § 27 cmt. d, decided on the merits, and the Granata court's finding of an impermissible

---

[7] We have assumed, for purposes of this opinion, that plaintiffs satisfied each prong of the five-part test set forth in Olivieri as our determination that offensive collateral estoppel should not be applied rests on the fundamental unfairness in doing so. With that said, we would be remiss if we did not point out the factual differences between this case and Granata. As noted, the Granata court concluded an ambiguity existed in the NJM policy not solely because NJM cited to N.J.S.A. 39:6A-3 in section A.2 but also by NJM's failure to fairly convey a change in the policy. NJM also allegedly affirmatively advised the policy holder that "there was no change in her coverage." Granata, slip op. at 2, 4. Conversely, here, the same UIM limits have existed since the parties entered into the operative insurance agreement, and the record does not indicate NJM made any misrepresentation regarding the scope of UIM coverage.

ambiguity in the policy was seemingly "essential to the judgment." Finally, it is undisputed that NJM was a party to Granata.

We conclude, however, that it would be improper to advance such a rigid, mechanical application of collateral estoppel here as to do so would ignore fundamental fairness principles that undergird the doctrine. Indeed, as the Supreme Court noted in Allen, "even if all five elements coalesce, it 'will not be applied when it is unfair to do so.'" Allen, 208 N.J. at 138 (quoting Olivieri, 186 N.J. at 521-22). In exercising discretion when applying the preclusive effect of a prior judgment or ruling, courts must "weigh economy against fairness." Barker v. Brinegar, 346 N.J. Super. 558, 566 (App. Div. 2002). And, where a party seeks collateral estoppel based on an interpretation of law, a "court is not precluded from readdressing the issue so that inequitable administration of the law may be avoided." State v. Santomauro, 261 N.J. Super. 339, 343 (App. Div. 1993) (citing City of Plainfield v. Pub. Serv. Elec. & Gas Co., 82 N.J. 245, 258-59 (1980)).

The Supreme Court has identified "a variety of fairness factors" favoring its application, including "conservation of judicial resources; avoidance of repetitious litigation; and prevention of waste, harassment, uncertainty and inconsistency." Olivieri, 186 N.J. at 523 (quoting Pace v. Kuchinsky, 347 N.J.

Super. 202, 216 (App. Div. 2002)). Factors disfavoring the application of collateral estoppel include circumstances where:

> [t]he party against whom [collateral estoppel] is sought could not have obtained review of the prior judgment; the quality or extent of the procedures in the two actions is different; it was not foreseeable at the time of the prior action that the issue would arise in subsequent litigation; and the precluded party did not have an adequate opportunity to obtain a full and fair adjudication in the prior action.
>
> [Ibid. (quoting Pace, 347 N.J. at 216).]

In addition to the factors noted in Olivieri, courts also look to the Restatement (Second) of Judgments § 29, which enumerates additional fairness considerations. Allen, 208 N.J. at 138. These include whether: 1) "[t]he determination relied on as preclusive was itself inconsistent with another determination of the same issue," Restatement (Second) of Judgments § 29; 2) "[t]he issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based," ibid.; and 3) "the court in the second action can conclude, without an evidentiary hearing, that the first determination was erroneous," id., Reporter's Note, cmt. j. Further, applying offensive collateral estoppel in the face of inconsistent determinations, see Restatement (Second) of Judgments § 29(4); Kortenhaus, 228 N.J. Super. at 169, is inappropriate when

those contrary decisions undermine the "underlying confidence" in the correctness of the prior determination and therefore "do[] not require that it be given effect against the party in litigation against another adversary." Restatement (Second) of Judgments § 29, cmt. f.

We have previously enforced "step-down provisions in insurance policies, provided the provisions are expressed in clear and unambiguous language." Morrison v. Am. Int'l Ins. Co. of Am., 381 N.J. Super. 532, 538 (App. Div. 2005). In Morrison, we upheld a step-down clause which limited recovery for bodily injury to non-resident relatives to "the minimum limit required by N.J.S.A. 17:28-1.1." Id. at 535. The plaintiff in that case, like plaintiffs here, argued that the policy provision was ambiguous in part because it "refer[red] to a statute rather than to a specific monetary amount." Id. at 538. In affirming summary judgment for the insurance company, we noted that the policy language did not create an ambiguity because "it simply and clearly states that the insurer's liability as to any insured who is not a named insured or resident family member is the minimum amount contained in the specifically identified statute." Id. at 541. Further, in Aubrey v. Harleysville Ins. Cos., 140 N.J. 397 (1995), the Supreme Court found that a step-down clause limiting liability coverage to the "amount by which the compulsory or financial-

responsibility law limits exceed the limit of [the customer's liability] insurance" was valid. Id. at 401, 408.

In its merits brief, NJM also cites two unpublished cases, inconsistent with Granata, which enforced automobile insurance policy provisions that referenced statutes in place of a specific monetary amount. In American Int'l Ins. Co. v. Bailey, No. A-4681-04 (App. Div. Apr. 12, 2006), we enforced an insurance policy provision limiting liability for bodily injury to non-family members to "the minimum limit required by N.J.S.A. 17:28-1.1." And, in Cox v. Tomasso, No. A-0106-17 (App. Div. Nov. 1, 2018),[8] we upheld an NJM policy provision which excluded coverage while the policyholder occupied "any vehicle insured by another motor vehicle policy in which [the policyholder] or a family member [were] a named insured," but still required NJM to provide "UM/UIM coverage for minimum limits required by New Jersey law for liability as set forth in N.J.S.A. 39:6A-3."

These decisions, as well as those in Morrison and Aubrey, directly conflict with Granata to the extent that it concluded that reference to a statutory provision in an insurance policy instead of a monetary amount creates a per se

---

[8] As noted in footnote 4, we cite to unpublished cases for the limited purpose of "the application of preclusionary legal principles." Pressler and Verniero, cmt. 2 on R. 1:36-3.

ambiguity. See also Cohen v. Allstate Ins. Co., 231 N.J. Super 97, 100 (App. Div. 1989) (enforcing a policy provision allowing either party to demand a trial where the arbitration award exceeds "the minimum limit for liability specified by the financial responsibility law of New Jersey"); D'Antonio v. State Farm Mut. Auto. Ins. Co., 262 N.J. Super. 247, 249-50 (App. Div. 1993) (same); Agency Rent-a-Car v. Indem. Ins. Co., 268 N.J. Super. 319, 323-25 (App. Div. 1993) (upholding a policy provision where the lessor would indemnify authorized operators for "liability and property damage up to the minimum dollar amounts required . . . by the applicable motor vehicle financial responsibility laws of the [s]tate"); Pribble v. State Farm Mut. Auto. Ins. Co., 933 P.2d 1108, 1110 (Wyo. 1997) (concluding that an automobile liability insurance policy that provided no coverage for any bodily injury to "any insured or any member of an insured's household to the extent the limits of liability of this policy exceed the limits of liability required by law" was "not ambiguous simply because one must refer to the laws of Wyoming for a complete understanding of the extent of that exclusion").

Not only do the aforementioned decisions reach different results than Granata, we are convinced they do so because the proposition advanced by

plaintiffs – that section A.2 is ambiguous merely because it references N.J.S.A. 39:6A-3 – is an incorrect statement of New Jersey law.

Our courts give "special scrutiny" to insurance contracts because of the "stark imbalance between insurance companies and insureds in their respective understanding of the terms and conditions of insurance policies." Zacarias, 168 N.J. at 594 (citing Gibson v. Callaghan, 158 N.J. 662, 669 (1999)). Generally, the words of an insurance policy are given their "plain, ordinary meaning." Id. at 595. In the absence of ambiguity, "courts should not write for the insured a better policy of insurance than the one purchased." Ibid. (quoting Gibson, 158 N.J. at 670).

Insurance policies, however, are "contracts of adhesion and as such, are subject to special rules of interpretation." Ibid. (citing Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537 (1990); Meier v. N.J. Life Ins. Co., 101 N.J. 597, 611-12 (1986)). When there is ambiguity in an insurance contract, courts interpret the contract to comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning. Ibid. "A policy provision in an insurance contract is considered ambiguous 'where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage.'" Id. at 598 (quoting Weedo v. Stone-E-Brick, Inc., 81

N.J. 247 (1979)).  Further, an ambiguity will be found to exist "in an insurance contract '[w]hen an insurance policy's language fairly supports two meanings, one that favors the insurer, and the other that favors the insured . . . .'" Cassilli v. Soussou, 408 N.J. Super. 147, 154 (App. Div. 2009) (quoting President v. Jenkins, 180 N.J. 550, 563 (2004)).

Courts will, therefore, "depart from the literal text and interpret it in accordance with the insured's understanding, even when that understanding contradicts the insurer's intent, if the text . . . cannot be understood without employing subtle or legalistic determinations." Zacarias, 168 N.J. at 601.  "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Id. at 594-95 (quoting Sparks v. St. Paul Ins. Co., 100 N.J. 325, 338-39 (1985)).

In Zacarias, cited in Granata and relied upon by plaintiffs, the Court determined that an intra-family exclusion was unambiguous and enforceable. Id. at 601.  In denying a claim under the plaintiff's boatowner's insurance policy for injury to his wife, Allstate cited a declarations sheet included with the plaintiff's policy which cross-referenced a provision within the policy itself. Id.

19

at 593. The referenced policy provision stated that Allstate would not cover "bodily injury to an insured person," defined as "you and, if a resident of your household . . . any relative . . . ." Ibid. In seeking a declaratory judgment to void the intra-family exclusion, the plaintiff argued that the terms of the policy were ambiguous because the declarations sheet did not "expressly list the intra-family exclusion." Id. at 594, 602.

The Zacarias Court rejected the plaintiff's argument and found that the policy's language was "direct and ordinary," it contained "[l]arge and bold type," the "provisions [were] clearly spaced," and it "explicitly disclaims coverage for injuries to insureds." Id. at 601-02. As such, the Court determined, no "entangled and professional interpretation" was required to understand the policy. Id. at 602.

Likewise, neither Eherenstorfer v. Div. of Pub. Welfare, Dep't of Hum. Servs., 196 N.J. Super. 405 (App. Div. 1984), nor Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544 (2015), also relied upon by plaintiffs, support the application of collateral estoppel under the circumstances presented. In Eherenstorfer, the court determined that a prior unpublished decision of our court that voided certain state regulations regarding eligibility for public assistance bound the Bergen County Welfare Board despite its unpublished status, because it "was a

party in that case and the regulations . . . involved [t]herein were directly in issue." Id. at 411. The Eherenstorfer court further held that "[a] party does not have the right to avoid a legal determination made by this court merely because a decision is unpublished." Id. at 412. In Badiali, the Supreme Court held that under the unique facts presented, it was not improper for NJM to use an unpublished decision "not for its legal value, but rather to prove that NJM acted in good faith in conducting its business as an insurance claims handler." Badiali, 220 N.J. at 560.

We agree that an opinion's unpublished status does not act as a bar to application of collateral estoppel principles in both the general context of Eherenstorfer and for the limited purpose set forth in Badiali. As we discuss at pages eleven to twenty, supra, however, application of that doctrine here would be unfair and inequitable. Unlike the invalid regulations in Eherenstorfer, we conclude that section A.2 of the NJM policy is not ambiguous, and the circumstances in Badiali are absent.

### III.

As noted, plaintiffs argue that section A.2 is ambiguous and unenforceable not because it conflicts with any word, sentence or provision in the NJM policy but instead because NJM incorporated the $15,000/$30,000 limits by

referencing a statute rather than specifically listing those limits. Accepting that under the circumstances plaintiffs would likely have had no occasion to even have seen the NJM policy as it was issued to Maria A. Menio-Reid, we conclude that NJM's clear reference to N.J.S.A. 39:6A-3 in the step-down clause, without additional indicia that the policy language "fairly supports two meanings," Cassilli, 408 N.J. Super. at 154, did not create an ambiguity such that "the average policyholder cannot make out the boundaries of coverage." Zacarias, 168 N.J. at 598. Like Zacarias, the language in the step-down clause is "direct and ordinary," and contains bold type. Further, like Morrison, the step-down clause was listed under a heading indicating that there would be a "limit of liability," such that an "average insured would have read the provision." See Morrison, 381 N.J. Super. at 543 (citing Bauman v. Royal Indem. Co., 36 N.J. 12, 25 (1961)).

We also note that under New Jersey law, "[a] word or phrase is not automatically rendered ambiguous simply because the policy fails to define it." Priest v. Roncone, 370 N.J. Super. 537, 544 (App. Div. 2004). "[I]n the absence of a specific definition in an insurance policy, the words must be interpreted in accordance with their ordinary, plain and usual meaning." Boddy v. Cigna Prop. & Cas. Cos., 334 N.J. Super. 649, 656 (App. Div. 2000) (quoting

<u>Daus v. Marble</u>, 270 N.J. Super. 241, 251 (App. Div. 1994)).

Here, the relevant provisions of N.J.S.A. 39:6A-3 unambiguously set forth the specific monetary limits of coverage. <u>See, e.g.</u>, <u>Sanders v. Or. Pac. States Ins. Co.</u>, 840 P.2d 87, 90 (Or. 1992) (enforcing an insurance policy that incorporated by reference a statute because the statutory language was clear). And, while we acknowledge that an insured would be required to locate the statute and read it, "[o]ur courts have held fast to the general rule that an insured is chargeable with knowledge of the contents of an insurance policy in the absence of fraud or inequitable conduct on the part of the carrier." <u>Edwards v. Prudential Prop. & Cas. Co.</u>, 357 N.J. Super. 196, 204 (App. Div. 2003); <u>see also</u> <u>Morrison</u>, 381 N.J. Super. at 542.[9] We therefore conclude that an average policy holder should be able to understand the plain language of the policy and N.J.S.A. 39:6A-3 "without employing subtle or legalistic determinations," <u>Zacarias</u>, 168 N.J. at 601, as it clearly provides that the minimum coverage limit for "injury to, or death of, one person, in any one accident" is $15,000.

---

[9] Were we to accept that it would have been better practice for NJM to specify the monetary limits in section A.2, as the <u>Zacarias</u> court stated, even a policy that is "far from perfect" may still "pass muster." <u>Zacarias</u>, 168 N.J. at 604. As we have discussed, the NJM policy "is sufficiently clear when reviewed under the rules of construction traditionally employed" in construing similar policies that the failure to list the $15,000/30,000 limits does not warrant the relief requested by plaintiffs. <u>Ibid.</u>; <u>see</u> <u>also</u> <u>Morrison</u>, 381 N.J. Super. at 538.

Finally, we disagree that plaintiffs' interpretation of section A.2 comports with the "objectively reasonable expectations" of (any) insured. <u>Id.</u> at 595 (quoting <u>Sparks</u>, 100 N.J. at 338-39). Indeed, such an interpretation would effectively delete section A.2 from the policy thereby permitting plaintiffs to access, unconstrained by the <u>actual</u> policy language, $300,000 in UIM benefits for which no one ever bargained and to which no reasonable insured could have objectively expected to receive.

Accordingly, we conclude it would be unfair and inequitable to apply offensive collateral estoppel against NJM. Nothing in our opinion should be construed to prevent the re-litigation of matters conclusively resolved amongst parties where it would be appropriate to do so. Further, we find no support in New Jersey law for the proposition that a policy is vague and ambiguous merely because it references a statute, nor do we conclude that an insured would have a reasonable expectation to receive $300,000 in UIM benefits under the circumstances presented.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2401-18T2