# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0447-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

N.S-A.,

     Defendant-Appellant,

and

J.D. and A.F.A.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.S.,
a minor.

_____

     Argued September 9, 2025 – Decided September 23, 2025

     Before Judges Sumners and Augostini.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0036-24.

Eric Storjohann, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Eric Storjohann, on the briefs).

Michelle McBrian, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Michelle McBrian, on the brief).

David B. Valentin, Assistant Deputy Public Defender, argued the cause for minor A.S. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, of counsel and on the brief).

PER CURIAM

Defendant N.S.-A (Nancy)[1] appeals the September 23, 2024, Family Part order terminating her parental rights after trial to her then eight-year-old daughter, A.S. (Anne).[2] Nancy alleges the trial judge committed a number of errors which deprived her of due process. Having reviewed the trial record, we

---

[1] We use initials and fictitious names for the parents and child to protect their privacy and the confidentiality of the record. R. 1:38-3(d)(12).

[2] Nancy has another child, X.S., born in 2020, who is in the custody of his father, D.D. and neither are parties to this appeal.

A-0447-24

are satisfied the competent, substantial trial evidence supports the trial judge's decision to terminate Nancy's parental rights. We affirm.

I.

The issues raised by Nancy on appeal focus on errors occurring during a second guardianship trial. Therefore, we summarize the evidence related to those errors.

The New Jersey Division of Child Protection and Permanency's (Division) involvement with Nancy and her family dates back to 2016 when Anne was born.[3] At Anne's birth, Nancy tested positive for Benzodiazepines. Neglect was not established by the Division at that time and the case was closed.

Three years later, in 2020, the Division removed Anne "due to [Nancy's] mental health and substance use" and placed with her maternal aunt L.S. (Lucy) and her great uncle F.S. (Flynn). Before removing Anne, the Division received

---

[3] A.A. (Alan) is listed on Anne's birth certificate as her father, but his whereabouts were unknown to Nancy. The Division searched for Alan, but as he is only known as a non-citizen residing outside the United States, the Division's required search in New Jersey was unsuccessful. Nancy additionally identified J.D. (Jack), who she met in Florida, as Anne's biological father. But due, in part, to differing accounts of his surname, he was not located in either Florida or New Jersey. Therefore, neither purported father was served nor represented. On February 22, 2024, the trial judge terminated both Alan's and Jack's parental rights to Anne.

A-0447-24

five referrals "documenting mental health concerns, homelessness, substance use concerns, physical abuse and [] domestic violence between Nancy and her mother," though all the allegations were found not to be established.

The Division worked with the family for a year, conducting supervised visits, tracking Nancy's treatment, and testing her for substances. During this period, Nancy gave birth to her son, X.S. (Xia),[4] born in 2020, whose father is D.D. (Dan).

Due to Nancy's non-compliance with court-ordered services, the Division filed its first guardianship complaint on July 14, 2020, seeking to terminate her parental rights to Anne. Later, in 2021, the first guardianship litigation was dismissed, and the case was remanded back to the FN docket after the trial judge found the Division had not provided reasonable efforts to Nancy. In August 2021, Anne was reunified with Nancy, and four months later, the litigation was dismissed.

On July 27, 2022, the Division received a new referral concerning Nancy's mental health. Over the next several months, Dan reported to the Division that Nancy's mental health had been declining. On September 28, 2022, Nancy took

---

[4] On September 22, 2022, after an emergent application, the trial judge granted Dan's request for custody of Xia. In its brief, the Division represents that Xia remains in Dan's custody; neither are parties to this appeal.

A-0447-24

Anne to Washington D.C., specifically to the Central Intelligence Agency (CIA) building, claiming to be "part of the CIA and Illuminati Family," and believing someone was targeting her.

This incident led to the Division removing Anne from Nancy and placing her with the maternal relatives again.[5]  On September 30, 2022, the trial judge granted the Division custody, care, and supervision of Anne.  After completing its investigation, the Division established the allegation of neglect but did not establish the remainder of the allegations.

At the time of Anne's removal, Nancy met with a crisis intervention screener and ultimately agreed to go to the hospital.  Nancy was involuntarily admitted and later transferred to Clara Maas Medical Center to receive a higher level of care.  Nancy remained hospitalized, and on October 6, 2022, was discharged.  Clara Maas recommended outpatient mental health treatment.

After Nancy's discharge from the hospital, the Division arranged supervised visits between her and Anne.  Although there were positive visits early on, throughout the litigation, Nancy's visits with Anne were inconsistent and sometimes problematic.  For example, Nancy cancelled several visits and

---

[5]  Dan obtained custody of Xia under an FD docket.

A-0447-24

by March 2023, the Division represented that "Nancy [was] only visit[ing] sporadically with Anne . . ."

During a visit on April 26, 2023, Nancy "grabbed [Anne] and picked her up very roughly . . . ranting about how she is 'part of the family' and being the 'chosen one' and how[] '[Anne] could not be separated from her until she was [seven] because she was part of her body.'" Following this incident, supervised visitation was temporarily suspended based on Anne's wishes. On May 4, 2023, Nancy admitted to fabricating a dental appointment note in an attempt to pick Anne up from school. Nancy's plan was thwarted by responding police officers.

During the first litigated case in 2020, Dr. Alison Strasser Winston psychologically evaluated Nancy. In the second litigated case, in February 2023, Dr. Winston conducted another psychological evaluation of Nancy. The evaluation was not fully completed, however, because, during the evaluation, Nancy reported experiencing chest pains, resulting in a call to 9-1-1. The evaluation ended before the psychological testing could be completed. Although the Division rescheduled the evaluation, Nancy failed to attend. As a result, Dr.

6

A-0447-24

Winston rendered an opinion without having administered any standardized tests.

In 2024, Dr. Winston performed a third evaluation. Dr. Winston was only able to meet with Nancy for about fifteen minutes because Nancy became upset and requested to leave the interview. Based on her clinical interview and observations of Nancy during the brief evaluation, Dr. Winston testified that Nancy had "deteriorated" psychologically since 2023.

From 2022 to 2023, the Division made repeated attempts to work with Nancy with limited success. In October 2023, the Division changed its permanency plan for Anne to termination of parental rights followed by adoption by Anne's current resource parents. The trial judge approved this plan because it found that Nancy "has largely not complied with court-ordered services to address her mental health and substance abuse issues." On December 4, 2023, the Division filed the second complaint for guardianship.

A four-day trial occurred in June and July 2024. The Division called two witnesses: the Division's adoption supervisor, Jessica Checo and Dr. Winston, who was qualified as "an expert in psychology, parental fitness, custody and bonding." Ms. Checo, who supervised the case since November 2023, testified regarding the Division's involvement with the family over the years. She

explained that the Division provided the resource parents with information regarding the permanency options of Kinship Legal Guardianship (KLG) and adoption. Ms. Checo also testified that she spoke directly with the resource parents about these options, and having been informed of these options, the resource parents consistently expressed their commitment to adoption.

Ms. Checo testified regarding the extensive efforts the Division made to refer Nancy to mental health services, including psychiatric evaluations, but to no avail. The Division offered weekly visits for Nancy and Anne. However, as Ms. Checo explained, Nancy frequently missed those visits.

Dr. Winston testified regarding the evaluations she conducted of Nancy in 2020, 2023, and 2024. Regarding Dr. Winston's opinion as to whether Nancy could safely parent Anne, she testified:

> A: That [Nancy is] not able to provide [Anne] with a safe and stable environment because of her severe mental health issues.
>
> Q: And do you have an opinion, if any, regarding whether she could provide that in the foreseeable future?
>
> A: Yes. My opinion is that she can't.
>
> Q: And what is the basis for that opinion?
>
> A: She is very delusional. She doesn't acknowledge her[] severe mental health issues. She's not getting the

A-0447-24

right level of treatment. Her treatment providers don't know. She's not being forthcoming with her treatment providers about her level -- about her serious mental health issues and she's in such denial and this has been going on for almost two years now and she's just not demon-- she has not demonstrated any progress in almost since July of 2022 since this case has been open and the lack of progress.

The defense called Dr. James Silvestri, who was admitted as an expert in psychotherapy. Dr. Silvestri initially had contact with Nancy in 2019 to perform an independent evaluation, which was not done. Between 2019 and March 2024, Dr. Silvestri acknowledged he had only had "sporadic" contact with Nancy. Dr. Silvestri criticized Dr. Winston's diagnoses and recommendations as inappropriate because some of the information she relied upon was hearsay, and she failed to mention Nancy's Attention Deficit Disorder diagnosis, which Dr. Silvestri characterized as the "predominant diagnosis."

Nancy testified on the final day of trial. She stated that she speaks with Anne every night, and that Anne initiates the call. She testified that the last time she used illegal substances was in 2019. She explained that the Division never helped her obtain a job or housing nor invited her to participate in a family team

9

meeting. When asked why she never participated in court-ordered services, Nancy replied that she was never advised to participate.

On September 23, 2024, the trial judge rendered a comprehensive oral decision, summarizing the evidence, finding the Division's witnesses credible, and analyzing the four-prongs of the best interests of the child test set forth in N.J.S.A. 30:4C-15.1. The judge concluded the Division satisfied the four-prongs by clear and convincing evidence, granted the Division's application to terminate Nancy's parental rights to Anne, and awarded the Division guardianship of Anne. This appeal followed.

II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's fact findings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to fact findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "Only when the trial [judge's] conclusions are so 'clearly mistaken' or

'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth and Fam. Servs. v. E.P., 196 N.J. 88, 104 (quoting G.L., 191 N.J. at 605).

To terminate parental rights, the State must demonstrate by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;[6]
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30: 4C-15.1(a)(1) to (4).]

The "prongs are not discreet and separate," but overlap with each other.

---

[6] On July 2, 2021, the Legislature enacted L. 2021, c. 154, deleting the last sentence of N.J.S.A. 30:4C-15.1(a)(2), which read, "[s]uch harm may include evidence that separating the child from [the child's] resource family parents would cause serious and enduring emotional or psychological harm to the child."

N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting G.L., 191 N.J. at 606-07).  The goal of this comprehensive statute is to effectuate the best interests of a child.

On appeal, Nancy contends the trial judge erred by (1) relying on the Division's expert, Dr. Winston's summary of Nancy's history with the Division in the 2020 evaluation and Dr. Winston's net opinion in the 2024 evaluation; (2) finding Nancy harmed Anne under prong two of the best interests of the child standard, N.J.S.A. 30:4C-15.1(a), by weighing and comparing the relationships Anne had with Nancy and her resource parents; (3) shifting the burden of persuasion to Nancy to explore alternatives to termination of parental rights; and (4) finding harm to Anne would be mitigated by ongoing contact with Nancy. The Division and Anne's attorney (the Law Guardian) urge us to affirm the order of guardianship, contending that the overwhelming, credible evidence establishes each of the four prongs of the best interests standard.

A.

Nancy contends the trial judge erred by adopting "as fact" Dr. Winston's nearly five-year-old review of the Division's litigation material summarized in Dr. Winston's 2020 evaluation from the prior litigation.  According to Nancy, she did not have access to the records from the prior litigation, nor were these

documents provided as evidence in the present case. Both the Division and the Law Guardian contend this assertion is without merit. We agree that Nancy's bald assertion is not borne out by the judge's decision.

Contrary to Nancy's assertion, the trial judge did not adopt this summary in its findings, but rather, merely recognized it as a "very good summary" provided by Dr. Winston in her 2020 report. The 2020 report documents the sources of information Dr. Winston reviewed. However, Nancy did not point to any facts purportedly cited to by the trial judge for which Nancy did not have supporting documents or sources. Additionally, Nancy did not identify any specific facts or portions of the judge's factual history that was derived solely from Dr. Winston's summary. As the trial judge correctly noted, Dr. Winston's factual summary only provided context and a historical perspective for the updated evaluations.

Nancy also contends the trial judge erred by relying on Dr. Winston's 2024 evaluation, alleging it was a net opinion. Both the Division and the Law Guardian disagree, asserting that Dr. Winston's evaluations were well-supported by the facts, the family's history, clinical interviews and observations of Nancy over a span of nearly four years, and psychological assessments of Nancy. Having reviewed Dr. Winston's comprehensive reports and trial testimony, we

13

reject Nancy's assertions. Dr. Winston detailed her findings and explained her conclusions comprehensively; thus, her opinion was not a net opinion. We are satisfied the trial judge did not abuse his discretion in relying on her expert conclusions.

An expert's opinion must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." State v. Townsend, 186 N.J. 473, 494 (2006). An expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372-74 (2011)). However, an expert's opinion will be excluded as a net opinion "if it is based merely on unfounded speculation and unquantified possibilities." Vuocolo v. Diamond Shamrock Chem. Co., 240 N.J. Super. 289, 300 (App. Div. 1990).

Here, Dr. Winston, unlike Dr. Silvestri, based her findings on clinical interviews and observations of Nancy made over several years. From those interviews and observations together with a review of various records, Dr. Winston concluded that Nancy is unable "to provide [Anne] with a safe and

14                                                                    A-0447-24

stable environment because of her severe mental health issues" and is unlikely to do so in the foreseeable future because she is "extremely delusional," has "very poor reality testing," does not "acknowledge her [] severe mental health issues" and has not engaged in the "right level of treatment."

At the outset of her testimony, Dr. Winston explained her methodology, and how she arrived at a diagnosis for Nancy, and supported her conclusions with specific observations and reasoning. Although Dr. Winston's 2024 evaluation was cut short due to Nancy leaving the evaluation early, during that brief time, Dr. Winston observed Nancy "present[ing] as highly paranoid, as she reported . . . being targeted by the State." Nancy also reported that "she was a victim of 'remote neural monitoring.'"

Moreover, Dr. Winston intended to administer the psychological testing to Nancy but was unable to do so because Nancy left the evaluation early. Nancy now contends the trial judge erred in admitting and relying upon Dr. Winston's expert opinion without any scientific testing. Nancy "cannot now argue that [Dr. Winston's] testimony should not be considered because [she] did not evaluate her through [psychological testing]." In re Civil Commitment of W.X.C., 407 N.J. Super. 619, 640 (App. Div. 2009).

However, even without the benefit of such testing, during her 2024 evaluation, Dr. Winston had sufficient data to conclude, to a reasonable degree of psychological certainty, that to reunify Anne with "a biological mother who continues to present with unaddressed delusional thought processes and substance use issues, would cause [Anne] serious and enduring emotional harm." These conclusions were well supported by Nancy's clinical presentation and interview during this final evaluation. Thus, the trial judge did not abuse his discretion by his admission of and reliance on Dr. Winston's comprehensive reports and well-reasoned expert opinion.

B.

Nancy challenges the trial judge's findings as to prongs one and two of N.J.S.A. 30:4C-15.1(a) relative to harm resulting from the parental relationship and her inability or unwillingness to eliminate that harm and provide a safe and stable home for Anne. Nancy contends the trial judge erred in finding clear and convincing evidence of harm to Anne because a prior court found insufficient proof of abuse and neglect under the preponderance of the evidence standard in the Title Nine proceeding involving the family.

Nancy further contends the judge erred in his prong two analysis by comparing the resource family's bond with Anne to Nancy's bond with Anne.

A-0447-24

Nancy supports this contention by pointing to the judge's finding:

> Dr. Winson talks about how [Anne] has learned to look to her resource parents to provide her with safety and security. She cannot and does not look to her mother as one who, on a consistent basis, could address those needs.

We disagree with Nancy's assertions as to both prongs one and two. The trial judge's findings as to prongs one and two were amply supported by substantial, credible evidence.

The fact-finding judge's 2023 determination that Anne was not an abused or neglected child under Title Nine did not bar either the initiation of a termination of parental rights proceeding or the trial judge's finding of harm to Anne under prongs one and two of the best interests standard. F.M., 211 N.J. at 444; N.J. Div. of Youth & Family Servs. v. A.P., 408 N.J. Super. 252, 261 (App. Div. 2009). Our Supreme Court has recognized the distinctions between Title Nine, abuse and neglect proceedings, and Title Thirty, guardianship matters. N.J. Div. of Youth and Family Servs. v. R.D., 207 N.J. 88, 105, 108-14 (2011).

"Abuse and neglect and termination proceedings are brought under separate statutory schemes, require different burdens of proof, and all for different remedies." Id. at 105 (citing Div. of Youth & Fam. Servs. v. R.D., 412 N.J. Super. 389, 400-01 (App. Div. 2010)). The Court further underscored the

17

"salient characteristic" distinguishing Title Nine proceedings from guardianship matters: "the immediacy and speed with which they are to be conducted." R.D., 207 N.J. at 109. "[A] finding of abuse and neglect . . . is only one of five statutory grounds for the termination of parental rights" under N.J.S.A. 30:4C-15. Id. at 112 (citing N.J. Div. of Youth & Fam. Servs. v. A.P., 408 N.J. Super. 252, 259 (App. Div. 2009)). Thus, "an abuse or neglect finding [under Title Nine] is not the only means by which to trigger a complaint seeking termination of parental rights." Ibid.

Here, the Division sought termination of Nancy's parental rights based on N.J.S.A. 30:4C-15(c), "which provides for termination where 'the best interests of any child . . . require that he [or she] be placed under guardianship." Ibid.; see also N.J.S.A. 30:4C-15.1(a) ("setting forth the four statutory tests for determining whether termination is in the 'best interests of the child.'"). Therefore, the trial judge did not err in rejecting Nancy's challenge to the finding of harm under prong one of N.J.S.A. 30:4C-15.1(a)(1) because there had been no finding of abuse and neglect previously made.

Prong two addresses whether the parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home, and the delay of permanent placement will add to that harm. N.J.S.A.

30:4C-15.1(a)(2); In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). The primary inquiry of prong two is whether in the foreseeable future, a parent can cease inflicting harm on the child and "is able to continue a parental relationship without recurrent harm to the child." Id. at 348-49.

Prong two also requires the trial judge to analyze the steps taken by a parent to maintain their relationship with a child and to foster an environment leading to the healthy development of the child. K.H.O., 161 N.J. at 352. Included in this analysis is whether the delay of permanent placement will add to the harm suffered by the child. N.J.S.A. 30:4C-15.1(a)(2); K.H.O., 161 N.J. at 348. Because children have a right to permanency, they "must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007).

Here, the trial judge properly concluded that Nancy's continued, unremedied, and chronic mental health issues continued to pose a substantial risk of harm to Anne, and those conditions were unlikely to change in the foreseeable future. Crediting Dr. Winston's expert opinion, the trial judge concluded that Nancy's continued refusal to acknowledge and address her "serious emotional instability . . . her delusional and paranoid ideation"

19

prevented Nancy from providing Anne now or in the foreseeable future with "appropriate care, supervision and protection." This delay in achieving permanency for Anne resulted in Anne remaining with her resource family for approximately four years at the time of the guardianship trial. As the trial judge properly noted, this delay in permanency resulted in Anne "look[ing] to her resource parents to provide her with safety and security." The trial judge's findings correctly focused on the steps taken by Nancy to maintain her relationship with Anne and to foster an environment leading to healthy, normal child development rather than comparing the two relationships as Nancy asserts. K.H.O., 161 N.J. at 352.

We are satisfied that the ample, credible evidence in the record supports the judge's findings on prongs one and two. Nancy's failure to consistently participate in services, her unabated mental health issues, and poor visitation record show that Anne was harmed by the parental relationship and Nancy has not been able or willing to eliminate that harm.

### C.

Nancy next contends the trial judge erred by shifting the burden of persuasion to her to explore alternatives to termination of parental rights under prong three of N.J.S.A. 30:4C-15.1(a). Nancy argues the trial judge improperly

20

admitted the hearsay KLG/adoption form signed by the resource parents. Because there was ample evidence in the record of the resource parents' steadfast commitment to adopt Anne, we are satisfied the trial judge did not shift the burden to Nancy of proving the second part of prong three.

Contrary to Nancy's assertion, the competent evidence supported the trial judge's conclusion that the resource parents were unequivocally committed to adopting Anne. As the trial judge noted, if Nancy wished to counter this evidence, she had the opportunity to do so by calling the resource parents or presenting other evidence to contradict the Division's assertions. The substantial evidence presented also supported the trial judge's conclusion that alternatives to termination of parental rights had been adequately explored and adoption was in Anne's best interests.

## D.

Finally, Nancy asserts the trial judge erred under the prong four analysis by factoring in the resource parents' willingness to permit ongoing contact between Nancy and Anne. Although any agreement to facilitate post-adoption contact is unenforceable in New Jersey, we reject Nancy's argument that the trial judge erred in considering the resource parents' willingness to permit ongoing contact between Nancy and Anne consistent with Anne's best interests.

A-0447-24

Prong four of the best-interests standard requires an assessment of whether termination of parental rights will do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). The fourth prong does not require a showing that no harm will befall the child because of the trial court's legal severance of biological ties. K.H.O., 161 N.J. at 355. Rather, the issue prong four requires the trial judge to address is whether any harm resulting from the termination of a child's legal relationships is outweighed by the good that will result. Ibid.

Here, the unrefuted expert opinion of Dr. Winston established that Anne has a secure and loving attachment with her resource parents where she has lived, at the time of trial, for almost four years. According to Dr. Winston, the resource parents are Anne's psychological parents.

Although Dr. Winston described Anne's attachment to Nancy as insecure, the resource parents recognized the benefits to Anne of maintaining some connection with her mother and brother Xia. The trial judge properly considered the resource parents' past efforts to support this contact and inferred from their past conduct the likelihood that they would foster contact after adoption. We discern no error in the trial judge's inference as to future contact and his conclusion that ongoing contact would mitigate any harm to Anne from the loss of her legal relationship with her mother. See In re Guardianship of J.N.H., 182

N.J. 29, 31 (2004); New Jersey Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 287 (2007).

To the extent we have not addressed any of Nancy's arguments, it is because we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division